UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

BRIAN WUOTI; KAITLYN WUOTI;　　　)
MICHAEL GANTT; and REBECCA GANTT,　)
　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
CHRISTOPHER WINTERS, in his official　)　　　No. 2:24-cv-00614-wks
capacity as Commissioner of the Vermont　)
Department for Children and Families, ARYKA )
RADKE, in her official capacity as Deputy　)
Commissioner of the Family Services Division, )
and STACEY EDMUNDS, in her official　)
capacity as Director of Residential Licensing )
and Special Investigations,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　)

**DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

By:　　Jonathan Rose
　　　Solicitor General
　　　Ryan Kane
　　　Deputy Solicitor General
　　　Patrick Gaudet
　　　Assistant Attorney General
　　　109 State Street
　　　Montpelier, VT 05609
　　　(802) 793-1646
　　　jonathan.rose@vermont.gov
　　　ryan.kane@vermont.gov
　　　patrick.gaudet@vermont.gov

　　　Counsel for Defendant

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

Introduction .....................................................................................................................1

BACKGROUND ..............................................................................................................2

I.   Vermont's Child Welfare Laws .....................................................................................2

    A.  Vermont's Foster Care System and Foster Parent Licensing...............................2

    B.  Development and Evolution of LGBTQ Protections in Vermont's Foster Care

        Licensing System .................................................................................................3

        1.   Recognizing the Problem .............................................................................3

        2.   The LGBTQ Workgroup................................................................................5

        3.   Policy 76 and LGBTQ Training .....................................................................6

        4.   Rule Updates ...............................................................................................8

        5.   Policy Implementation .................................................................................8

II.  Ongoing research supports the need for LGBTQ foster care policies like DCF's .................11

    A.  LGBTQ children and youth are more likely to be abused or neglected..........................11

    B.  LGBTQ children are overrepresented in the foster care system and are particularly
        vulnerable to harm.................................................................................................12

    C.  Familial acceptance is critical to improving outcomes for LGBTQ children and

        young adults...........................................................................................................13

III. Plaintiffs' Licenses.........................................................................................................14

    A.  Plaintiffs Brian and Kaitlyn Wuoti..................................................................14

    B.  Plaintiffs Rebecca and Michael Gantt .............................................................17

LEGAL STANDARD.......................................................................................................19

ARGUMENT ....................................................................................................................19

I.   Plaintiffs are not likely to succeed on their First Amendment claims .....................................19

i

A.   The LGBTQ Policy does not implicate Plaintiffs' free speech rights.............................19

    1.   The state may regulate conduct, even if the regulation incidentally burdens speech. ..................................................................................................................20

    2.   The LGBTQ Policy regulates conduct, not speech. ....................................................21

B.   The LGBTQ Policy does not implicate Plaintiffs' right to free association. ..................24

C.   The LGBTQ Policy does not burden Plaintiffs' free exercise rights ..............................26

    1.   The policy is neutral toward religion ........................................................................26

    2.   The LGBTQ Policy is generally applicable ...............................................................29

D.   The LGBTQ Policy survives any level of scrutiny ........................................................32

    1.   The State's interest in protecting the well-being of children, and particularly those over which it exercises legal custody, is compelling ................................................33

    2.   The LGBTQ Policy is narrowly tailored ...................................................................36

II.   The LGBTQ Policy is not unconstitutionally vague................................................................37

III.   The remaining injunction factors favor denial of preliminary injunctive relief....................39

CONCLUSION...............................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                                        **Page**

*Alford v. City of New York,* 413 F. Supp. 3d 99 (E.D.N.Y. 2018)................................................33

*Arcara v. Cloud Books, Inc.,* 478 U.S. 697 (1986)........................................................................20

*Bates v. Pakseresht,* No. 2:23-CV-00474-AN, 2023 WL 7546002
      (D. Or. Nov. 14, 2023)...............................................................22, 27, 28, 30, 34, 36

*Blais v. Hunter,* 493 F. Supp. 3d 984 (E.D. Wash. 2020).......................................................28, 30

*Boy Scouts of Am. v. Dale,* 530 U.S. 640 (2000) ..........................................................................24

*Church of the Am. Knights of the Ku Klux Klan v. Kerik,* 356 F.3d 197 (2d Cir. 2004) ..............20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hileah,* 508 U.S. 520 (1993)...26, 27, 28, 31, 32

*Clavin v. Cty. of Orange,* 38 F. Supp. 3d 391 (S.D.N.Y. 2014) ....................................................38

*Clementine Co., LLC v. Adams,* 74 F.4th 77 (2d Cir. 2023).........................................................20

*Employment Division, Department of Human Resources of Oregon  v. Smith,*
      494 U.S. 872 (1990)..............................................................................26, 29, 30, 31

*Ferrelli v. N.Y. Unified Court Sys.,* No. 22-CV-68 (LEK), 2022 WL 673863
      (N.D.N.Y. Mar. 7, 2022).............................................................................................29

*Fortress Bible Church v. Feiner,* 694 F.3d 208 (2d Cir. 2012) .....................................................30

*Frey v. Nigrelli,* 661 F. Supp. 3d 176, 207 (S.D.N.Y. 2023).........................................................39

*Friend v. Gasparino,* 61 F.4th 77 (2d Cir. 2023).........................................................................33

*Fulton v. City of Phila.,* 593 U.S. 522 (2021)........................................................26, 29, 30, 31, 32

*Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490 (1949).............................................20, 21, 22

*Grayned v. City of Rockford,* 408 U.S. 104 (1972)........................................................................38

*Hobbs v. County of Westchester,* 397 F.3d 133 (2d Cir. 2005) .....................................................36

*Illinois Bible Colls. Ass'n v. Anderson,* 342 F.3d 752 (7th Cir. 2003) .........................................29

*Kane v. De Blasio,* 19 F.4th 152 (2d Cir. 2021) .....................................................................26, 27

*Libertarian Party of Erie Cty. v. Cuomo,* 970 F.3d 106 (2d Cir. 2020) ........................................38

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Beach,* 510 F.3d 253 (3d Cir. 2007)..........29

*Local 8027, AFT-N.H., AFL-CIO v. Edulblut,* 651 F. Supp. 3d 444 (D.N.H. 2023).....................24

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Com'n,* 584 U.S. 617 (2018) .....................................28

*McCullen v. Coakley,* 573 U.S. 464 (2014) ..................................................................................22

*National Institute of Family & Life Advocates v. Clark,* No. 2:23-cv-229,
      2024 WL 3027983 (D. Vt. 2024)................................................................................38

iii

*New Hope Family Services, Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020) .................................23, 24

*New York v. Ferber,* 458 U.S. 747, 756-57 (1982) .......................................................33

*Prince v. Massachusetts,* 321 U.S. 158 (1944) .............................................................33

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ..........................................................21

*Reed v. Town of Gilbert*, 576 U.S. 155, 135 S.Ct. 2218 (2015) ...............................33

*Reynolds v. Quiros,* 25 F.4th 72 (2d. Cir. 2022) ...........................................................38

*Rizzo v. New York City Dep't of Sanitation*, No. 23-CV-7190, 2024 WL 3274455 ...............29, 31

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ...............................................................24

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) .........................26

*Rubin v. Garvin,* 544 F.3d 461 (2d Cir. 2008). ..............................................................38

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) .....................20

*Sherbert v. Verner*, 374 U.S. 398 (1963) .......................................................................30

*Slattery v. Hochul*, 61 F.4th 278 (2023) ..........................................................................24

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ...........................................................20

*Southerland v. Giuliani,* 4 Fed. App'x 33 (2d Cir. 2001) ............................................33

*Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997) ...............39

*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010) ..........................37

*We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) .......................19, 29

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...........................................19

## Statutes & Rules

33 V.S.A. § 101(5). ............................................................................................................2

33 V.S.A. § 104(9). ............................................................................................................2

33 V.S.A. § 151 ..................................................................................................................2

33 V.S.A. § 4903 ..............................................................................................................21

33 V.S.A. § 4905(b). ...........................................................................................................1

33 V.S.A. § 4906 ................................................................................................................2

Licensing Rules for Foster Homes in Vermont, https://outside.vermont.gov/dept/DCF/
Shared%20Documents/FSD/Rules/Licensing-Rules-Foster-Care.pdf. ......................... passim

Department of Health and Human Services, Administration for Children and Families,
*Designated Placement Requirements Under Titles IV-E and IV-B for LGBTQI+
Children*, 89 F.R. 34818 (Apr. 30, 2024) (the "HHS Designated Placement Rules") ....... 12-14

**Other Authorities**

Caitlyn Ryan et al., *Family Acceptance in Adolescence and the Health of LGBTQ Young Adults*, 23 J. of Child & Adolescent Psychiatric Nursing 205, 210-211 (Nov. 2010), https://onlinelibrary.wiley.com/doi/10.1111/j.1744-6171.2010.00246.x. ...........................14

Centers for Disease Control and Prevention,  Youth Risk Behavior Survey Data Summary & Trends Report: 2011-2021, https://www.cdc.gov/yrbs/dstr/pdf/YRBS_Data-Summary-Trends_Report2023_508.pdf ...............................................................................12

Caitlin Ryan, *Helping Diverse Families Learn to Support Their LGBTQ Children to Prevent Health and Mental Health Risks and Promote Well-Being*, San Francisco, Family Acceptance Project, San Francisco State University, https://lgbtqfamilyacceptance.org/wp-content/uploads/2021/11/FAP-Overview_Helping-Diverse-Families6.pdf ...........................14

DCF Policy 76: Supporting and Affirming LGBTQ Children & Youth (eff. Feb. 27, 2020) https://perma.cc/EMX6-CPUE ................................................................................. passim

DCF Policy 220: Role and Functions of RLSI (eff. April 19, 2018) https://outside.vermont.gov/dept/DCF/Shared%20Documents/FSD/Policies/Policy220.pdf. ..3

DCF Policy 221: Foster Care Licensing (eff. May 2, 2019) ("Policy 221") https://outside.vermont.gov/dept/DCF/Shared%20Documents/FSD/Policies/Policy221.pdf. ...........................................................................................................................3

Family Acceptance Project, San Francisco State Univ., *Supportive Families, Healthy Children*, https://outside.vermont.gov/dept/DCF/Shared%20Documents/FSD/Policies/Policy221.pdf. ...........................................................................................................................13

Hilary Cass, *The Cass Review: Independent Review of Gender Identity Services for Children and Young People: Final Report* (April 2024) ...........................................................36

Sabra L. Katz-Wise et al., *Lesbian, Gay, Bisexual, and Transgender Youth and Family Acceptance*, 63 Pediatric Clinics N. Am. 1011 (Dec. 2016), available at https://perma.cc/43FS-5653 ...............................................................................14

Sarah Mountz, Revolving Doors: LGBTQ Youth at the Interface of the Child Welfare and Juvenile Justice Systems, 1 LGBTQ Pol'y J. 29 (2010-2011), available at https://perma.cc/KU6M-6Y87 ...............................................................................4

Society for Adolescent Health and Medicine, Recommendations for Promoting the Health and Well-Being of Lesbian, Gay, Bisexual, and Transgender Adolescents: A Position Paper of the Society for Adolescent Health and Medicine, 52 Journal of Adolescent Health 506, 507-508 (2013) ...................................................................................................5

Steven T. Russell et al., *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. Adolescent Health 503 (Oct. 2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6165713/............14

Steven T. Russell & Jessica N. Fish, *Mental Health in Lesbian, Gay, Bisexual, and Transgender (LGBT) Youth*, 12 Ann. Rev. Clinical Psychol. 465 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4887282/pdf/nihms-789458.pdf ...............14

*Supporting LGBTQ+ Youth: A Guide for Foster Parents*, Child Welfare Info. Gateway 4 (2021), https://perma.cc/385P-K4CT ...................................................................................14

The Trevor Project, National Survey on LGBTQ Youth Mental Health 2023, https://www.thetrevorproject.org/survey-2023/......................................................................11

U.S Dep't of Health & Human Servs. Administration on Children, Youth and Families, Information Memorandum Log No: ACYF-CV-IM-22-01, March 2, 2022, https://www.acf.hhs.gov/sites/default/files/documents/cb/im2201.pdf............................11, 12

U.S. Gov't Accountability Off., GAO-22-104688, FOSTER CARE Further Assistance from HHS Would be Helpful in Supporting Youth's LGBTQ+ Identities and Religious Beliefs (2022), https://www.gao.gov/assets/gao-22-104688.pdf  .................................................11, 12

Vermont Child Welfare Partnership, Kin, Foster and Adoptive Families Online Learning, https://vermontcwtp.org/kin-foster-and-adoptive-families/......................................................7

Vt. Dep't of Health, Youth Risk Behavior Survey, https://perma.cc/82AV-F7WB (surveys available from 2005 through 2021).................................................................................................4

## INTRODUCTION

Vermont demands of Plaintiffs the same thing it demands of *all* foster parents: a demonstration of their willingness and ability to put the needs of children in state custody first. There is nothing remarkable about the policy—referred to throughout as the "LGBTQ Policy"— at issue in this case. It operates in much the same way as the myriad other requirements and restrictions imposed on those caring for foster children. The policy does not require foster parents to change their minds about issues like sexual orientation, gender identity, or gender expression. Nor does it prevent them from advocating for their beliefs. The policy is not, as Plaintiffs have called it, a "gender-ideology litmus test," an "ideological vision," or "virtue signaling." It requires only that foster parents agree to provide foster children with what the research has shown to be one of their most basic, universal needs: acceptance of who they are.

Plaintiffs are right that people of faith play an important role in Vermont's foster care system. The State's policy does not change that. Indeed, many people of faith—and some who hold more traditional views of sexual orientation and gender identity *not* grounded in religion— recognize that respecting a vulnerable child's sexual or gender identity does not mean compromising their beliefs any more than, say, respecting the spiritual identity of a child with a different religious background or the cultural identity of a child with a different racial background. The LGBTQ Policy has not, as Plaintiffs' filings insinuate, led large numbers of people of faith to abandon the system.

Vermont simply requires all foster parents to be willing to respect, accept, and provide reasonable, evidence-based support to any child the state entrusts to their care. That does not violate the First Amendment, nor is it unconstitutionally vague. The Court should deny Plaintiffs' Motion for Preliminary Injunction.

1

**BACKGROUND**

I.    **Vermont's Child Welfare Laws**

    A.    **Vermont's Foster Care System and Foster Parent Licensing**

DCF is required to care for children when a family "is unable to provide the necessary care and protection to ensure the right of any child to sound health and to normal physical, mental, spiritual, and moral development." 33 V.S.A. § 101(5). To that end, when children are committed to DCF's custody, DCF is authorized to "[s]upervise and control" those children and "provide for their care, maintenance, and education." *Id.* § 104(9). It frequently does so by placing the child with a foster parent. DCF maintains legal custody, but caregivers must make "careful and sensible parental decisions that maintain the health, safety, and best interests of a child or youth" while "at the same time encouraging the emotional and developmental growth of the child." *Id.* § 4906. Prospective foster parents must obtain a license from DCF. *Id.* § 4905(b). Before DCF may grant a license, it must "visit and inspect" the foster parents' home and "make further inquiry and investigation as the Commissioner [of DCF] may direct." *Id.* § 151(4). DCF is authorized to adopt rules governing the licensing process, *id.* § 151, and it has done so. *See* Licensing Rules for Foster Homes in Vermont (the "Rules").[1]

The Licensing Rules are designed "to assure the care and safety of children who have to live in homes other than their own." DCF must investigate not only the "safety and adequacy of the home for the care of children," but also foster parents' "commitment to foster care," their "ability and willingness . . . to work cooperatively in supports of the child's case plan," and their ability "to provide positive, constructive experiences for all children in their care." Rule 010. To that end, the Rules imposes a comprehensive set requirements and restrictions on foster parents.

---

[1] https://outside.vermont.gov/dept/DCF/Shared%20Documents/FSD/Rules/Licensing-Rules-Foster-Care.pdf.

*See*, e.g., Rules 201, 301 (expectations to be knowledgeable, supportive, and effective caregivers); Rules 316-320 (privacy and confidentiality); Rules 324-325 (restrictions on discipline); Rules 329-332 (health care decisionmaking); Rules 335-337 (food/nutrition obligations); Rules 401-430 (home safety and sleep arrangements); Rules 431-434 (transportation requirements).

Family service workers from DCF's Residential Licensing and Special Investigation ("RLSI") Unit review foster parents' compliance with the Licensing Rules. *See*, DCF Policy 220: Role and Functions of RLSI (eff. April 19, 2018).[2] This includes a comprehensive background check, interviews, and a home site visit. *See* Rule 020; DCF Policy 221: Foster Care Licensing (eff. May 2, 2019) ("Policy 221").[3] Foster care licenses are generally valid for up to three years, at RLSI's discretion. *See* Policy 221 at 8. Licenses may be denied or revoked at any time if the licensee fails to meet any of the licensing requirements. Rule 037.

**B.    Development and Evolution of LGBTQ Protections in Vermont's Foster Care Licensing System**

### 1.    Recognizing the Problem

In mid-2015, DCF realized that the foster care system's treatment of LGBTQ[4] youth needed high-level attention. Declaration of Lindsay Barron ("Barron Dec.") ¶¶ 5-8. Community partners like the advocacy organization Outright Vermont were reporting youth concerns regarding the system's lack of attention to their needs. *Id.* At the same time, DCF was fielding increasing questions about how to deal with a variety of emerging, LGBTQ-relevant issues like exploration of sexual orientation, gender identity, and gender expression ("SOGIE"), sleeping

---

[2] https://outside.vermont.gov/dept/DCF/Shared%20Documents/FSD/Policies/Policy220.pdf.

[3] https://outside.vermont.gov/dept/DCF/Shared%20Documents/FSD/Policies/Policy221.pdf.

[4] We use "LGBTQ" here as short for "LGBTTQQIAPP," which is a collection of identities short for lesbian, gay, bisexual, trans, two spirit, queer, questioning, intersex, asexual, pansexual, and polysexual.

arrangements, medical issues (puberty blockers, hormones, etc.), and privacy. *See id.* ¶¶ 6-7. DCF did not then have a policy on the treatment of LGBTQ foster children, and therefore its ability to respond to the concerns and questions was limited. *Id.* ¶ 7.

Moreover, emerging research had begun to show that LGBTQ children and youth were overrepresented in the foster care system and were experiencing poor outcomes. *Id.* ¶¶ 8-15. In Vermont, data compiled by the Vermont Department of Health in its biennial Vermont Youth Risk Behavioral Survey reflected substantially increased risk of negative outcomes (e.g., depression, suicidality, sexual assault, missing school, bullying, substance abuse, etc.) among LGBTQ youth. Vt. Dept. of Health, 2013 Vermont Youth Risk Behavioral Survey at 7 ("Compared to heterosexual youth, [LGBTQ] youth are at higher risk for depression, tobacco, alcohol and other drug use, suicide, and unhealthy sexual behaviors.").[5]

And Vermont's findings were consistent with the broader research, which made clear that challenges facing LGBTQ children and youth were particularly stark in the foster care system. *See* Barron Dec. ¶¶ 9-14. Years earlier, for example, a paper published in the LGBTQ Policy Journal at the Harvard Kennedy School concluded "that LGBTQ youth face large-scale breaches of justice in [the foster care system], indicates that a well-coordinated collaborative policy reform effort is not only warranted but also necessary." Sarah Mountz, Revolving Doors: LGBTQ Youth at the Interface of the Child Welfare and Juvenile Justice Systems, 1 LGBTQ Pol'y J. 29, 29, 42 (2010-2011) (attached to Barron Dec. as Ex. 1).[6]

---

[5] Subsequent survey reports reached similar conclusions based on similar data. *See generally* Vt. Dep't of Health, Youth Risk Behavior Survey, https://perma.cc/82AV-F7WB (surveys available from 2005 through 2021).

[6] Also available at https://perma.cc/KU6M-6Y87.

Similarly, based on the literature identifying problems faced by LGBTQ youth in the foster care system, the Society for Adolescent Health and Medicine concluded in 2013 that "[a]ntidiscrimination policies should be implemented to protect LGBTQ youth in foster care settings." Society for Adolescent Health and Medicine, *Recommendations for Promoting the Health and Well-Being of Lesbian, Gay, Bisexual, and Transgender Adolescents: A Position Paper of the Society for Adolescent Health and Medicine*, 52 Journal of Adolescent Health 506, 507-508 (2013) (attached to Barron Dec. as Ex. 2).

### 2.    The LGBTQ Workgroup

To respond to those emerging concerns, DCF convened an LGBTQ Workgroup in early 2016. Barron Dec. ¶ 15. The Workgroup included staff from the Department's central office, district offices and RLSI, other state agencies, program managers from residential treatment facilities, community organizations, the Vermont Child Welfare Training Program, and legal counsel. *Id.* ¶¶ 15-16. It reviewed the scientific research and regulatory landscape and made policy recommendations to improve outcomes for LGBTQ youth in foster care. *Id.* ¶¶ 17-19. For example, in response to the Workgroup's early recommendations, RLSI began approving variances allowing for bedroom sharing for children and youth based on their gender identity rather than their sex assigned at birth. *Id.* ¶ 19; *see* Licensing Rule 419.

In mid-2016, the LGBTQ Workgroup conducted surveys and convened focus groups to solicit feedback from youth in DCF custody. *Id.* ¶ 20. That work resulted in a September 2016 report summarizing the feedback. *See* LGBTQ+ Youth in Vermont Foster Care Summary of Focus Group Responses ("Focus Group Report") (attached to Barron Dec. as Ex. 3). The report began with a poignant quote from one participant: "*I felt like I couldn't come out. I knew for years but I hid, I kept it in.*" Focus Group Report at 1. The feedback also suggested that LGBTQ

children in the system felt (1) unsafe identifying themselves as LGBTQ to both DCF and caregivers, (2) misunderstood by various actors in the system and (3) unsupported by both DCF and caregivers. *Id.* at 3-5. Among the conclusions that emerged from the group feedback sessions was the following:

> Caregivers, providers, and child welfare personnel should not require youth to conform to traditional conceptions of gender nor punish youth who are transgender or gender nonconforming. Adults should not require youth to dress, behave, or express themselves in narrowly prescribed ways because of their gender. Adults should use the name and pronoun preferred by an individual youth, whether or not they confirm to the youth's birth sex.

Focus Group Report at 2.

### 3.    Policy 76

In early 2017, based on that feedback, the growing body of research showing poor outcomes for LGBTQ children in foster care, and the work of other states, DCF created a new policy aimed at improving outcomes by providing "safe, healthy, and inclusive environment[s] for all children and youth served by the division." *See* DCF Policy 76: Supporting and Affirming LGBTQ Children & Youth [ECF Doc. No. 17-6].[7] Reflecting the growing scientific consensus, Policy 76 recognized that "[e]xploring one's sexual orientation, gender identity, and gender expression (SOGIE) is a normal part of human identity development," and committed to prohibiting "discrimination and bias based on a child or youth's real or perceived sexual orientation, gender identity, or gender expression." *Id.*[8]

Policy 76 directs staff to consider caregivers' "attitude and behavior" about children's sexual or gender identity, and committed to "making ongoing efforts to recruit, train, support,

---

[7] Also available at https://perma.cc/EMX6-CPUE.

[8] Since January 2017, Policy 76 has since been amended twice. Here, "Policy 76" generally refers to current version of the policy unless context suggests otherwise.

and retain resource families who are LGBTQ affirming and supporting." Policy 76 at 3. DCF also created an "LGBTQ Committee" to assist staff with some of the more challenging issues arising out of DCF's obligation to care for LGBTQ children like legal name and gender identity changes, safety concerns regarding placements, and decisions regarding medical treatment. Policy 76 at 4.

Later in 2017, after additional feedback and research, DCF amended Policy 76. Barron Dec. ¶ 24. The amendment provided new guidance regarding "additional supports and resources" for families "to work through barriers they may face regarding their child's gender or sexual identity." It also enhanced confidentiality protections for LGBTQ youth—allowing children and youth to determine, for the most part, when and to whom to disclose their SOGIE—and gave affected youth an increased voice in the Department's LGBTQ Committee. *See* Memo re: Family Servs. Policy 76 at 1-2 (attached to Barron Dec. as Ex. 5).

The LGBTQ Workgroup also convened a subgroup to develop training and other resources for DCF staff and foster parents. Barron Dec. ¶ 31. It coordinated with partner organizations to apply for grant funding. *Id.* The Washington County Youth Service Bureau ultimately received the grant and worked with the larger team to develop a series of training modules for DCF workers and foster families on how to support LGBTQ children and youth. *See id.* ¶ 32; *see generally* Vermont Child Welfare Partnership, Kin, Foster and Adoptive Families Online Learning, https://vermontcwtp.org/kin-foster-and-adoptive-families/.

In 2018, DCF received feedback from the Forward Youth Advisory Board, a group of young people between the ages of 14 and 22 with experience in Vermont's foster care. *See* Barron Dec. ¶ 33. In 2018, Forward prepared a "Youth Advocacy Document" highlighting the need for more "quality foster homes," where youth "are comfortable, safe, and treated with

respect and dignity." *See* Youth Advocacy Document (attached to Barron Dec. as Ex. 7).

Forward expressly recommended that DCF "[r]equire all foster parents to take the LBGTQ+

training," offered by the Department. *Id.* at 5.

### 4.    Rule Updates

Finally, in November 2022, DCF initiated rulemaking to clarify its Foster Care Licensing

Rules for LGBTQ youth. *See* 383 Vt. Gov't Reg. 25 (Dec. 2022). The new rule added language

to Rule 200 expressly prohibiting a foster parent from discriminating against a foster child based

on a number of characteristics, including sexual orientation and gender identity. *Id.* It also added

language to Rule 201 requiring foster parents to support children in wearing hairstyles, clothing,

and accessories affirming of the child's racial, cultural, tribal, religious, or gender identity. *Id.*

Finally, it added a new provision to Rule 035 prohibiting DCF from granting variances to from

Rules 200, 201, and 315. *Id.* The rule updates went into effect on May 16, 2023.

### C.    Policy Implementation

DCF began incorporating the principles and requirements of Policy 76 into its Foster

Care Licensing application process soon after the policy was created. Barron Dec. ¶ 34;

Declaration of Stacey Edmunds ("Edmunds Dec.") ¶ 5. RLSI workers have long been tasked

with determining if prospective foster parents satisfy all requirements of the Rules, including that

applicants demonstrate "[k]nowledge of child and adolescent development and the needs of

children," *see* Licensing Rule 201.2, and that they are able to "meet the physical, emotional,

developmental and educational needs of each foster child, in accordance with the child's case

plan," *see* Licensing Rule 301; Edmunds Dec. ¶ 9. Since Policy 76 was implemented, DCF has

included principles of LGBTQ protection in those analyses. *See* Policy 76 at 6 ("The division is

committed to making ongoing efforts to recruit, train, support, and retain foster families who are

LGBTQ affirming and supporting."); Edmunds Dec. ¶¶ 6-9. Thus, prospective foster parents are assessed for their ability to, among other things, be "respectful of the dignity of all children, youth, and families" and keep "children and youth safe while meeting their unique needs, regardless of whether those needs are related to their sexual orientation, gender identity, or gender expression." *See* Policy 76 at 1.

Following the policy update in 2017, DCF conducted extensive training for stakeholders and participants in the foster care system on the practical and regulatory impacts of the policy update. For example, it partnered with the judiciary to have bench-bar presentations and discussions in every county to support the policy and conducted in-person training sessions with both FSD staff and caregivers in the local district offices. Barron Dec. ¶ 37.

RLSI also added a series of "self-assessment" questions to the foster care license application form. Barron Dec. ¶¶ 35-36. In the self-assessment questionnaire, applicants are asked to rate on a scale of 1 to 5 their agreement with a series of statements, including "My family would be accepting and supportive of an LGBTQ foster child." *Id.* ¶ 35; *see* Edmunds Dec. Ex. 1 at 7-11 (application form including self-assessment questionnaire). The questionnaire is intended to (1) help the applicant gauge their readiness and fit for foster care, (2) prompt district staff and resources coordinators to have in-depth conversations about areas in which applicants express hesitation, and (3) allow RLSI to have and continue these conversations in assessing the applicants' suitability for foster care. Barron Dec. ¶ 36.

While assessing license applications, RLSI workers will initiate conversations with the applicant about the questions and reasons for the applicants' rating. Edmunds Dec. ¶¶ 11-13. In many cases, that conversation helps to clarify the applicant's obligations and helps to alleviate any applicant concerns, resulting in their ability to demonstrate compliance with the applicable

rules. *Id.* This has been RLSI's practice when an applicant provides a low rating in response to the statement "My family would be accepting and supportive of an LGBTQ foster child." Edmunds Dec. ¶ 12. Upon receiving such a response, the RLSI worker will discuss the low rating with the applicant to determine whether they can still satisfy the Rules. *Id.*

In many cases, applicants who initially rate themselves at the low end of the scale do so because they do not understand what it means to be supportive, or because they do not know that much about LGBTQ youth. *Id.* RLSI uses these discussions—frequently along with the training resources developed by the LGBTQ Workgroup—to help applicants better understand the requirements, and what it means to be supportive of an LGBTQ child's identity. *Id.* Frequently, even applicants who have rated themselves very low at the outset express greater confidence after that discussion. *Id.* Many ultimately are licensed. *Id.*

And that is the case for those who express both religious and non-religious reasons for their hesitancy. *Id.* ¶ 12. Indeed, families who have initially expressed discomfort with the prospect of caring for a for religious reasons have been approved after discussions about LGBTQ youth in which they determine that they can commit to being supportive and affirming of an individual child in their care (for example, by respecting the child's wishes about the use of pronouns, allowing the child to attend events and join supportive organizations supportive of LGBTQ issues, allowing a child to dress and groom in a manner consistent with their identity, etc.). *Id.*

The reasons for an applicant's potential discomfort with fostering LGBTQ children—including religious reasons—play no part in RLSI's analysis. *Id.* ¶ 13. Foster parents come from a wide range of spiritual and philosophical backgrounds, and DCF accepts prospective foster parents of all creeds and religions. *Id.* Its concern is centered on the well-being of the child,

which includes, among the many other aspects of the foster parent-child relationship DCF regulates, the child's sexual and gender identity. *Id.* ¶ 14. The issue is whether a prospective foster parent can care for a child, even if they are LGBTQ, in a responsible, supportive, and respectful manner. *Id.*

## II.   Ongoing research supports the need for LGBTQ foster care policies like DCF's.

DCF's policy is consistent with a substantial body of research demonstrating that LGBTQ children are overrepresented in foster care and more vulnerable to poor outcomes. The research shows that affirmation and acceptance of their identities is critically important to their well-being.

### A.   LGBTQ children and youth are more likely to be abused or neglected.

In a 2023 nationwide study of 40,000 LGBTQ youth, 40 percent of cisgender respondents and more than half of transgender and non-binary youth reported having seriously considered suicide in the past year,[9] while more than 20% reported having attempted suicide in that year. LGBTQ youth are more likely to experience abuse and neglect, and those who enter foster care are more likely to have adverse experiences and outcomes. GAO Report at 1, 5-7. LGBTQ youth are "especially at risk for experience multiple forms of victimization." *Id.* at 5-6. Many LGBTQ youth also experience familial rejection, exploitation, abuse and neglect."[10]

---

[9] The Trevor Project, National Survey on LGBTQ Youth Mental Health 2023, https://www.thetrevorproject.org/survey-2023/ ("Trevor Survey"); *see also* U.S. Gov't Accountability Off., GAO-22-104688, FOSTER CARE Further Assistance from HHS Would be Helpful in Supporting Youth's LGBTQ+ Identities and Religious Beliefs 6 (2022) ("GAO Report"), https://www.gao.gov/assets/gao-22-104688.pdf (citing the 2020 Trevor Survey).

[10] *See* U.S Dep't of Health & Human Servs. Administration on Children, Youth and Families, Information Memorandum Log No: ACYF-CV-IM-22-01, March 2, 2022 (the "HHS Info Memo"), https://www.acf.hhs.gov/sites/default/files/documents/cb/im2201.pdf.

These trends are similar in Vermont. The most recent Vermont Youth Risk Behavior Survey shows that LGBTQ students are "twice as likely as heterosexual cisgender students to be bullied during the past month," "significantly more [likely] to have been threatened with a weapon," "significantly more likely . . . to skip school due to safety concerns," "nearly three times more likely . . . to have experienced unwanted sexual contact," "significantly more likely . . . to experience poor mental health," and two and a half times more likely to feel sad or hopeless.[11]

**B.    LGBTQ children are overrepresented in the foster care system and are particularly vulnerable to harm.**

In addition to the harms faced by LGBTQ youth generally, LGBTQ youth are overrepresented in the foster care system and are more likely than other youth to have adverse experiences in foster care. GAO Report at 1; *see also* Department of Health and Human Services, Administration for Children and Families, *Designated Placement Requirements Under Titles IV-E and IV-B for LGBTQI+ Children*, 89 F.R. 34818, 34821 (Apr. 30, 2024) (the "HHS Designated Placement Rules") ("[A] significant body of evidence demonstrates that LGBTQI+ children are overrepresented in the child welfare system and face poor outcomes in foster care.").

Up to 30% of youth in foster care nationally identify as LGBTQ, compared to about 10% in the general population. GAO Report at 1; HHS Designated Placement Rules at 34821 (collecting sources). Moreover, LGBTQ youth are "more likely to be mistreated, experience more time in foster care, experience more placements in foster care, and less likely to be placed in 'family-based' settings." *Id.* at 6-7 (citations omitted). LGBTQ youth are also more likely to

---

[11] Vermont Department of Health, 2021 Vermont Youth Risk Behavior Survey: Statewide Results, https://perma.cc/QZD6-ASXS; *see also* Centers for Disease Control and Prevention, Youth Risk Behavior Survey Data Summary & Trends Report: 2011-2021, https://www.cdc.gov/yrbs/dstr/pdf/YRBS_Data-Summary-Trends_Report2023_508.pdf.

experience homelessness. HHS Info Memo at 3. These experiences in foster care often add to the fears, shame, and rejection already experienced by LGBTQ children and young adults, leading to even higher incidence of depression, suicidality, and substance abuse.

### C. Familial acceptance is critical to improving outcomes for LGBTQ children and young adults.

A parent's refusal to be affirming to an LGBTQ child in their care has a significant impact on the health and well-being of the child. Rates of depression, suicide, and harmful behaviors are closely correlated with the level of acceptance of the LGBTQ children and young adults feel in their home. "[H]ighly rejected" LGBTQ young adults are more than eight times more likely to have attempted suicide than LGBTQ young adults who were not rejected by their parents at all or only "rejected a little." Family Acceptance Project, San Francisco State Univ., *Supportive Families, Healthy Children*, at 5.[12] Similarly, "highly rejected" LGBTQ young adults are nearly six times as likely to report high levels of depression, more than three times as likely to use illegal drugs, and more than three times as likely to be at risk for sexually transmitted disease. *Id.*; *see also* HHS Designated Placement Rule at 34821-23, n. 1-27 (collecting sources).

Thus, acceptance is the key to better outcomes. The 2020 Trevor Survey—at the time the largest survey of LGBTQ youth mental health ever conducted—found that "the five most common ways LGBTQ youth reported feeling supported by their parents or caregivers included having been welcoming to their LGBTQ friends or partners, talking with them respectfully about their LGBTQ identity, using their name and pronouns correctly, supporting their gender expression, and educating themselves about LGBTQ people and issues." HHS Designated Placement Rules at 34821 (citing The Trevor Survey). Studies of LBGTQ youth have

---

[12] https://familyproject.sfsu.edu/sites/default/files/documents/FAP%20LDS%20Booklet%20pst.pdf.

consistently shown the importance of parental support of their sexual orientation and gender expression. Steven T. Russell & Jessica N. Fish, *Mental Health in Lesbian, Gay, Bisexual, and Transgender (LGBT) Youth*, 12 Ann. Rev. Clinical Psychol. 465, 473-475 (2016).[13] Family support and acceptance are associated with a litany of improved outcomes, including greater self-esteem, better health, less depression, lower substance abuse, less suicidal ideation, and fewer suicide attempts. *Id.*[14] Moreover, "caregiver behavior that is not affirming, including refusing to use a child's chosen name and pronouns, or ridiculing or name-calling because of the child's LGBTQI+ identity, contributes to increased risks for serious health concerns for the child." HHS Designated Placement Rules at 34821-22.[15]

## III.    Plaintiffs' Licenses

### A.    Plaintiffs Brian and Kaitlyn Wuoti

The Wuotis first applied for a foster care license in 2014. Edmunds Dec. ¶ 19. During the application process, the Wuotis disclosed that Mr. Wuoti was a pastor in a church and that faith made Wuotis want to become foster parents. *Id.*; *see* Edmunds Dec. Ex. 1. RLSI approved the Wuotis' application. Edmunds Dec. ¶ 19. In April 2018, the Wuotis applied to renew their foster

---

[13] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4887282/pdf/nihms-789458.pdf

[14] *See also* Sabra L. Katz-Wise et al., *Lesbian, Gay, Bisexual, and Transgender Youth and Family Acceptance*, 63 Pediatric Clinics N. Am. 1011 (Dec. 2016), *available at* https://perma.cc/43FS-5653; Caitlyn Ryan et al., *Family Acceptance in Adolescence and the Health of LGBTQ Young Adults*, 23 J. of Child & Adolescent Psychiatric Nursing 205, 210-211 (Nov. 2010), *available at* https://onlinelibrary.wiley.com/doi/10.1111/j.1744-6171.2010.00246.x.

[15] Citing Caitlin Ryan, *Helping Diverse Families Learn to Support Their LGBTQ Children to Prevent Health and Mental Health Risks and Promote Well-Being*, San Francisco, Family Acceptance Project, San Francisco State University, https://lgbtqfamilyacceptance.org/wp-content/uploads/2021/11/FAP-Overview_Helping-Diverse-Families6.pdf; *see also* Stephen T. Russell et al., *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. Adolescent Health 503 (Oct. 2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6165713/; *Supporting LGBTQ+ Youth: A Guide for Foster Parents*, Child Welfare Info. Gateway 4 (2021), https://perma.cc/385P-K4CT.

care license. *Id.* ¶ 20. In recommending that DCF renew the Wuotis' license, DCF's investigator

again noted that for employment, Mr. Wuoti was pastor. And again, DCF approved the Wuotis'

renewal application. *Id.*

DCF received the Wuotis' second renewal application on May 17, 2021. *Id.* After some

delays in processing, the DCF investigator solicited feedback from the local district and

conducted a home visit, neither of which revealed cause for concern. *Id.* ¶¶ 21-22. Following the

home visit, the investigator sent the Wuotis the self-assessment questionnaire. *Id.* In an email

response to the investigator, the Wuotis rated themselves as a three out of five in response to the

statement "My family would be accepting and supportive of an LGBTQ foster child." Pls.' Mot.

Ex. E [ECF Doc. No. 17-10] at 11-12. In a February 28, 2022 email response, the investigator

thanked the Wuotis for their responses, but noted that it was "unusual to get an answer of 3 on

the LGBTQ question on the grid" and asking the Wuotis to "tell me a bit more about your

answer, and what might be needed to increase that answer to a 4 or 5." *Id.* at 11.

Ms. Wuoti responded on March 2, explaining that "we realize not everyone would

interpret our Biblical views as accepting and supporting." *Id.* at 10. She explained that "[j]ust

like we would never encourage a child to pursue pornography, sex outside of marriage, or

feelings of pedophilia, we would not encourage a child to pursue their feelings of

homosexuality." *Id.* She further discussed having "same sex attraction" herself, and her personal

choice not to pursue those feelings. *Id.* She explained that she and Mr. Wuoti would "encourage

(not force)" an LGBTQ child to make the same choice. *Id.* The investigator noted "the

overwhelming evidence of how important acceptance and support is to outcomes for LGBTQ

youth," and that "[v]ery often, the wors[t] sorts of outcomes you can imagine . . . are shown to be

tied to living in homes that were not affirming of their sexual and gender identities." *Id.* He

explained that an inability to "encourage and support children in their sexual and gender identity" would make the Wuotis ineligible for a foster care license renewal. *Id.*

On April 20, 2022, DCF issued a Notice of Decision revoking the Wuotis' license due to their failure to satisfy two requirements of the Licensing Regulations. Pls.' Mot. Ex. C [ECF Doc. No. 17-8] at 1. First, DCF found that the Wuotis had not demonstrated compliance with Section 201.2, which required the Wuotis to demonstrate "[k]nowledge of child development and the needs of children." *Id.* Second, the Wuotis had failed to show that they would be able to "meet the physical, emotional, developmental, and educational needs of each foster child, in accordance with the child's case plan." *Id.* RLSI found that "beyond simply an absence of active support to child to embrace their identity, [the Wuotis] stated [their] intention to actively 'encourage (not force)' a child to deny their LGBTQI+ identity." *Id.*

The Wuotis appealed DCF's decision to the Vermont Human Services Board (the "Board"), which held an in-person hearing on December 6, 2022. The Board denied the Wuotis' appeal on April 7, 2023. *Id.* It found that the Wuotis' position was not consistent with DCF's expectation that foster parents be "able to parent children during those times when they are experimenting or coming to realizations about sexual attraction and gender identity or expression" because

> petitioners stated intent to encourage a child to deny same-sex attraction or a particular gender identity and to 'not encourage a child to pursue their feelings of homosexuality' were reasonably demonstrative to the investigator of a lack of understanding child development and, at the least, an inability to meet the emotional and developmental needs of an LGBTQ child.

*Id.* at 17. The Board also rejected the Wuotis' argument that the Department could simply place a young child in their care "who doesn't express an [LGBTQ] identity," observing that "sexual orientation or gender identity might not be apparent or visible" and that "screening a child for

16

sexual orientation or gender identity would be problematic because it would cross boundaries respecting the child's privacy." *Id.* at 18.

### B.    Plaintiffs Rebecca and Michael Gantt

The Gants first received a foster care license in June 2016. Edmunds Dec. ¶ 26. Like the Wuotis, the Gantts also disclosed their religious faith during the initial licensing process, and like the Wuotis, the Gantts originally were approved by DCF and fostered children successfully during the time they were licensed. *Id.* In late 2023, however, it came to DCF's attention that the Gantts would not be able to demonstrate compliance with the LGBTQ Policy. *See id.* ¶ 27.

The issue arose after DCF circulated notice of the May 2023 Licensing Rule updates. *Id.*; *see* Part I.B, *supra*. Following the Gantts' receipt of an email notifying foster parents of the update, *see* Pls.' Ver. Compl. Ex. D [ECF Doc. No. 1-4], Michael Gantt exchanged emails with DCF Resource Coordinator Michelle Colburn regarding the impact of the new rules. Edmunds Dec. ¶ 27. During that exchange, Mr. Gantt explained to Ms. Colburn that "while I can unconditionally love and support any child in my care, I cannot in good conscious affirm behaviors, beliefs, or ideas that go against my religious convictions (like using any identified pronoun a child wants us to)." *Id.* ¶ 27; Pls.' Mot. Ex. D [ECF Doc. No. 17-9] at 2. He asked to "clarify a few things" with DCF. *Id.* Ms. Colburn informed RLSI investigator Christopher Murphy of Mr. Gantt's statements during their conversations because the information suggested that the Gantt's may not be able to comply with the Foster Licensing Regulations. *See* Edmunds Dec. ¶¶ 27-28.

On January 22, 2024, Mr. Gantt and Mr. Murphy spoke on the phone. During the call, Mr. Gantt reiterated that while he and his wife would be loving and supporting of any child placed in their care, being "affirming just takes things to another level I just cannot go to."

Edmunds Dec. Pls. Mot. Ex. D [ECF Doc. No. 17-9] at 2. Mr. Murphy gave some specific examples of what it might mean to be affirming, including taking a DCF-placed child to a gay pride event, allowing non-cis-gender haircuts or modes of dress, or supporting a child's participation in an LGBTQ student organization. *Id.* Mr. Gantt said that he and his wife would not allow the first two things, and that he doubted they would allow the third. *Id.* Mr. Murphy then offered additional training and resources that might help to clarify the regulatory requirements, to which Mr. Gantt responded that "I know our beliefs are not going to change." *Id.* at 3.

Following that conversation, Ms. Gantt emailed FSW Murphy, suggesting that the Gantts could use nicknames for transgender children, "so long as the name doesn't suggest that the child belongs to the opposite sex." *Id.* Ms. Gantt explained that the Gantts could not "use a name like Maria to refer to a boy, or use male pronouns for a girl because we believe God created two distinct sexes and cannot lie to a child about their God given identity. We cannot attend events like pride parades because we cannot support what that type event stands for and promotes." *Id.*

Following those communications, on February 6, 2024, DCF issued a Notice of Decision revoking the Gantts' foster care license for failure to comply with Licensing Rules 037 ("A license may be denied or revoked if the applicant or licensee fails to meet any licensing rules."), 301 ("Foster parents shall meet the physical, emotional, developmental and educational needs of each foster child, in accordance with the child's case plan."), and 315 ("Foster parents shall support children in wearing hairstyles, clothing, and accessories affirming of the child's racial, cultural, tribal, religious, or gender identity."). *Id.* at 1-2. The Gantts did not appeal the decision to the Human Services Board.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "To obtain preliminary injunctive relief that will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) (quotations omitted). "The movant must also show that the balance of equities supports the issuance of an injunction." *Id.* at 280.

## ARGUMENT

### I.      Plaintiffs are not likely to succeed on their First Amendment claims.

Plaintiffs' First Amendment claims are unlikely to succeed. The LGBTQ Policy regulates conduct—i.e. the way they treat the children in their care. To the extent it requires them to speak at all, any burden on their speech does not implicate their rights to free speech or free association under the First Amendment. Moreover, policy is neutral and generally applicable and does not unconstitutionally restrict Plaintiffs' free exercise rights. But in any event, Plaintiffs' free speech and free exercise claims also fail because the LGBTQ survives any level of constitutional scrutiny, including strict scrutiny. It is the only feasible way to serve one of the most compelling interests: the State's interest in protecting the health and well-being of children in its care.

#### A.      The LGBTQ Policy does not implicate Plaintiffs' free speech rights.

Plaintiffs are unlikely to succeed on their free-speech claims because the LGBTQ Policy—like the Foster Licensing Rules generally—regulate caregivers' *conduct*, not their speech. The State is not compelling the Plaintiffs to endorse or espouse any particular ideology.

It simply requires them to demonstrate an ability to do what is in the best interest of any child the state entrusts to their care.

    **1.**      **The state may regulate conduct, even if the regulation incidentally burdens speech.**

"The First Amendment protects the right to express one's viewpoint, but 'it does not guarantee ideal conditions for doing so, since the individual's right to speech must always be balanced against the state's interest' in regulating harmful conduct." *Clementine Co., LLC v. Adams*, 74 F.4th 77, 87 (2d Cir. 2023) (quoting *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004)). "Because 'every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities,' a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment." *Kerik*, 356 F.3d at 209 (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986)).

In other words, a regulation of conduct that incidentally compels or restricts speech does not offend the Constitution so long as the purpose of the law is the regulation of the conduct and not the speech. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.") (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.").

    So, for example, a state can prohibit employers from discriminating in hiring based on race, even if that requires an employer to take down a "White Applicants Only" sign, *Rumsfeld*,

547 U.S. at 62, and the antitrust laws can prohibit "agreements in restraint of trade." *Giboney*,

336 U.S. at 490; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) (noting that

"sexually derogatory" words "may produce a violation of Title VII's general prohibition against

sexual discrimination," and that prohibited acts "are not shielded from regulation merely because

they express a discriminatory idea or philosophy"); *id.* at 385 (noting that it might be permissible

to prohibit "burning a flag in violation of an ordinance against outdoor fires").

### 2.  The LGBTQ Policy regulates conduct, not speech.

Here, the LGBTQ Policy—like the Rules in general—are directed fundamentally at non-

expressive *conduct*, not speech. Consistent with DCF's statutory mandate to "protect and

promote the welfare of children," 33 V.S.A. § 4903, the Rules are designed "to assure the care

and safety of children who have to live in homes other than their own," and require foster parents

to "provide positive, constructive experiences for all children in their care." Rule 010. Likewise,

Policy 76 is aimed fundamentally at "provid[ing] a safe, healthy, and inclusive environment for

all children and youth." Policy 76 at 1. To that end, it commits the Department to "prohibiting

discrimination and bias based on a child or youth's real or perceived sexual orientation, gender

identity, or gender expression," *id.* at 2, and "making ongoing efforts to recruit, train, support,

and retain foster families who are LGBTQ affirming and supporting." *Id.* at 6.

It does those things through the enforcement of several conduct-focused provisions in the

Licensing Rules, like the express anti-discrimination provisions in Rule 200, 201.10, and 315, as

well as the broader foster parenting requirements found, for example, at Rule 201 (requiring

foster parents to "exhibit knowledge of child development and the needs of children") and Rule

302 ("Foster parents shall meet the physical, emotional, developmental and education needs of

each foster child, in accordance with that child's case plan."). The central focus in all of this is to

regulate the conduct of foster parents to ensure the well-being of the children in their care. *See*, *e.g.*, *Bates* v. *Pakseresht*, No. 2:23-CV-00474-AN, 2023 WL 7546002, at *16 (D. Or. Nov. 14, 2023) (finding that a similar policy in Oregon "does not facially compel or restrict speech, but rather seeks to regulate an applicant's conduct in creating a respectful, affirming, and supportive home for a child in [the state's] care").

To be sure, the LGBTQ Policy may require Plaintiffs to say or refrain from saying certain things, like respecting a child's chosen pronouns, refraining from trying to impose certain views on a child, or that homosexuality is aberrational, etc. But the same is true of many other of DCF's conduct-based licensing rules. For example, Rule 201.1 requires foster parents to exhibit "[h]ealthy patterns of social and interpersonal relationships," which may require them to refrain from using demeaning or intimidating language to the child or other family members. Likewise, Rule 201.3 requires foster parents to discipline children "in a constructive and educational manner," which prohibits speech-based discipline that is not "constructive" or "educational." And Rule 338 requires foster parents to "respect the religious beliefs and cultural heritage of foster children," which likely prohibits foster parents from telling children that their religious beliefs and cultural heritage are inferior.

All these rules are intended solely to protect foster children's health and wellbeing by requiring the adults caring for them to respect and support them as individuals. *See, e.g.*, *Giboney*, 336 U.S. at 502 (fact that conduct may be "initiated, evidenced, or carried out by means of language" does not subject all conduct regulation to First Amendment scrutiny). They are not directed at the foster parents' expression, nor are they intended to remove a particular set of beliefs from the "marketplace of ideas." *See*, *e.g.*, *McCullen v. Coakley*, 573 U.S. 464 (2014) (purpose of the First Amendment is "to preserve an uninhibited marketplace of ideas").

The Second Circuit's decision in *New Hope Family Services, Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020) (cited in Pls.' Mem. at 7), does not compel a different conclusion. In *New Hope*, the court held that a Christian adoption agency *plausibly alleged*—not that it was likely to succeed on—a First Amendment claim. *Id.* at 176-77.[16] The court found that because New Hope was vested with "considerable discretion" to place children for adoption based on the best interests of the child, a regulation requiring it to place children with same-sex couples could force it to engage in conduct that sent a message to the public that it agreed placement with a same-sex couple is in a child's best interests. *Id.*

Unlike the adoption agency in *New Hope*, though, foster parents are not exercising "discretion" in all aspects of how they care for children in the State's custody. The state has the right—and the obligation—to determine what types of care are the most important for the wellbeing of foster child. *See* Argument, Part I.D.1, *infra*. Compliance with the LBGTQ Policy does not require foster parents to express either agreement with the policy or that support for a child's sexual and gender identity are in the child's best interest.[17] *New Hope* is neither controlling nor helpful here.

Vermont's foster care licensing regime governs the relationship between a specific foster child—or specific children—and a foster parent. It ensures that youth in state custody are not subject to harm from the foster placement and are able to live a safe, healthy, and normal life to the greatest extent possible. It does not require foster parents to abandon their beliefs or even

---

[16] *See id.* at 176 (holding that the "pleadings record admits a *plausible inference*" that the Agency's expressive rights were impacted and that "discovery is warranted to determine the extent to which the required compliance will restrict or compel New Hope's speech").

[17] Again, consider the Licensing Rules' requirements around respecting the religious identity of foster children. Surely requiring foster parents to support and encourage a child's religious faith or identity does not mean that foster parents would be viewed as having to compromise their own beliefs to do so even if they are prevented from discouraging the child's faith.

hide them from the public. At most, it prevents foster parents—who are caring for children in state custody—from sharing some views with those children in unsupportive manner. *Cf. Local 8027, AFT-N.H., AFL-CIO v. Edulblut*, 651 F. Supp. 3d 444, 453 (D.N.H. 2023) (holding that "the First Amendment does not protect the curricular speech" of primary and secondary school teachers). Any burden on speech the LGBTQ Policy imposes is merely incidental to its main purpose, which is to regulate non-expressive conduct. The LGBTQ Policy does not implicate Plaintiffs' right to free speech.

> **B.    The LGBTQ Policy does not implicate Plaintiffs' right to free association.**

Plaintiffs "free association" claim is also unlikely to succeed. To begin, while the Supreme Court has recognized a First Amendment right of "associat[ion] for the purpose of engaging in those activities protected by the First Amentment—speech, assembly, petition for the redress of grievances, and the exercise of religion," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984), that right typically arises in the context of a group's right to exclude those whose participation would "severely burden" its expressive rights, as in the cases Plaintiffs cite. *See*, *e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (Boy Scouts' right to exclude gay scout leader); *U.S. Jaycees*, 468 U.S. at 615 (private club's right to exclude female members); *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) (right of pro-life pregnancy center to exclude pro-choice employees); *New Hope*, 966 F.3d at 180 (adoption agency's right to exclude same-sex couples). The State does not understand Plaintiffs to be asserting a right to fully exclude LGBTQ foster children from their care here, though, and so those cases are unhelpful.

In any event, assuming for the sake of argument that the free association analysis *does* apply, Plaintiffs have not demonstrated a likelihood of success on a claim that the LGBTQ Policy "severely burdens" that right. *See Slattery*, 61 F.4th at 287 (analysis requires a "severe

burden" on associational rights to justify imposition of strict scrutiny). The policy does not, by its terms, prevent foster parents from associating or from declining to associate with anyone. In its most basic sense, the policy requires only that foster parents meet the physical, emotional, developmental and educational needs of the child in their care by supporting all aspects of that child's identity. To be sure, as an example of the way a parent could show support and acceptance to an LGBTQ child, Policy 76 suggests that staff "encourage" parents, family members, and resource families to "[b]ring young people to LGBTQ organizations and events in the community." Policy 76, App. II. But it does not *require* them to do so, nor does it require foster parents to attend those events themselves.[18]

More broadly, Plaintiffs drastically overstate the significance to their personal beliefs of being holistically affirming to a particular child in their care, which is all the Policy requires. The LGBTQ policy requires only that Plaintiffs not reject or diminish any aspect of a child's identity, whether that be racial, cultural, sexual, or gender because of the substantial harm that such actions have on children and the state's obligation to ensure that children are placed in safe and supportive homes. To the extent Plaintiff wish to "sincerely and effectively convey" their beliefs, Pls.' Mem. at 13, in their communications with others they would be free to do so. The Policy does not prohibit Plaintiffs from attending church or "speaking about the gospel" with others. Plaintiffs' free association rights are not burdened by the LGBTQ Policy.

---

[18] Plaintiffs point out that in its decision revoking the Gantts' license, the investigator noted Mr. Gantt's statement that he would not "take a DCF-placed child to a gay pride event." *See* Pls.' Mot. Ex. D [ECF Doc. No. 17-9]. Viewed in context, though, the investigator was plainly using that statement as just one example—among several others—of ways in which the Gantts expressed an unwillingness to accept and support a foster child's sexual orientation or gender identity. That note does not suggest DCF would require the Gantts to attend a parade if, for example, they otherwise expressed openness to a child attending.

### C.     The LGBTQ Policy does not burden Plaintiffs' free exercise rights.

"The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990)). But a person's religious convictions do not exempt that person from all state regulation. *Smith*, 494 U.S. at 878-79; *Fulton v. City of Phila.*, 593 U.S. 522, 541 (2021) (declining to overturn *Smith*). Even if a "law has the incidental effect of burdening a particular religious practice," it "need not be justified by a compelling government interest" if it is neutral and of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("*Lukumi*") (citing *Smith*, 494 U.S 872).

The level of scrutiny that applies in a free exercise case therefore depends on the nature of the law at issue. A neutral law of general applicability is subject to rational basis review. *Kane v. De Blasio*, 19 F.4th 152, 164 (2d Cir. 2021) (quoting *Smith*, 494 U.S at 877). "Laws and government policies that are either non-neutral or not generally applicable, however, are subject to strict scrutiny." *Id.* (citing and quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)). The LGBTQ Policy is both neutral toward religion and generally applicable; it is therefore subject only to rational basis review.

### 1.     The policy is neutral toward religion.

The "minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. A law "lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.* Plaintiffs do not—and cannot seriously—contend that the LGBTQ Policy discriminates on its face. Nothing in the LGBTQ Policy conditions application of the licensing requirements on an applicant's religion or applies

the requirements differently to religious and non-religious applicants. Thus, it is beyond serious dispute that the requirements here are facially neutral. *See Bates*, 2023 WL 7546002, at \*4 (finding similar policy facially neutral, "as it makes no reference to any specific religious practice, nor does it implicate religion on its face"); *cf. Kane*, 19 F.4th at 164 (holding mandatory vaccination law was facially neutral where language did "not single out employees who decline vaccination on religious grounds").

Of course, as Plaintiffs note, a facially neutral law may still violate the neutrality requirement if it "targets religious conduct for distinctive treatment." *Id.* (quoting *Lukumi*, 508 U.S. at 534). And "[t]here are many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct." *Lukumi*, 508 U.S. at 533. In determining whether a law targets religion, courts look to "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* at 639.

But Plaintiffs cannot demonstrate that the LGBTQ Policy "targets" religious conduct either. The historical background—laid out in detail above—shows the LGBTQ Policy was a response to (1) a significant body of research showing that LGBTQ youth were overrepresented in the foster care system and suffering poorer outcomes because of the lack of supporting, affirming care in the system, (2) feedback from children and youth in the system, who attested, first hand, to the problem, and (3) its own inability to respond to SOGIE-related issues that were being raised more and more frequently. Again, the policy was not the result of some "political" or "religious" determination favoring "progressive" views, as Plaintiffs are fond of framing the issue. Pls.' Mem. at 16. And the State here is not calling *any* particular political view

"offensive," as the Supreme Court cautioned against in *Masterpiece Cakeshop*. *See id.* (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018)). The LGBTQ Policy was the result of a careful, data-driven policymaking process aimed at responding to the research and advancing the well-being of the children in its care. *See* Background, Parts I.B & II, *supra*.

Plaintiffs also argue that the LGBTQ Policy is not neutral because it is overinclusive—that is, it "proscribe[s] more religious conduct than necessary to achieve [the State's] stated ends." Pls.' Mem. at 16 (quoting *Lukumi*, 508 U.S. at 538). On this point, they urge the Court to follow the Eastern District of Washington's lead in *Blais*, which held that a similar policy in Washington was not neutral because it "disproportionately exclude[d] persons who observe certain religious faiths from qualifying as foster parents based solely on speculative future conduct." *Blais v. Hunter*, 493 F. Supp. 3d 984, 998 (E.D. Wash. 2020). As the District of Oregon pointed out in *Bates*, though, there is no evidence to suggest that the LGBTQ Policy "disproportionately excludes" religious applicants. *See Bates*, 2023 WL 7546002, at *9 (noting that the "LGBTQ+ community has existed in controversy for reasons that extend beyond religion," and that plaintiffs had "provided no evidence or support for the idea that the bulk of foster care applicants who would object to issues that LGBTQ+ children face would do so on religious grounds").

Indeed, in DCF's experience, those disqualified under the Licensing Rule have asserted both religious and non-religious justifications, and some applicants who asserted religious concerns generally about sexuality and gender identity have been approved for licenses. *See* Part I.C, *supra*; *Bates*, 2023 WL 7546002, at *9. And in any event, like Oregon, Vermont "does not conduct any form of assessment regarding the reasons why an individual may be unable to

28

respect, accept, and support a child's LGBTQ+ identity." *Id.*; *see* Part I.C, *supra*. Vermont does not favor secular viewpoints over religious ones.

### 2.     The LGBTQ Policy is generally applicable.

In pursuing legitimate interests, a government also may not selectively place burdens only on conduct motivated by religious reasons. Thus, "a law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 534 (quotations omitted). In *Fulton*, the problem with the City's anti-discrimination statute was that it allowed for "a formal system of entirely discretionary exemptions" from the rule at issue. *See id.* at 536. And "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* at 534 (quoting *Smith*, 494 U.S. at 884).

But "[t]he 'mere existence of an exemption procedure,' absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable and subject to strict scrutiny." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 288-89 (2d Cir. 2021) (quoting *Lighthouse Inst. for Evangelism, Inc. v. City of Long Beach*, 510 F.3d 253, 276 (3d Cir. 2007)). "To hold otherwise, in fact, would 'create a perverse incentive for government entities to provide no religious exemption process in order to avoid strict scrutiny.'" *Rizzo v. New York City Dep't of Sanitation*, No. 23-CV-7190, 2024 WL 3274455, at *6 (S.D.N.Y. July 2, 2024) (quoting *Ferrelli v. N.Y. Unified Court Sys.*, No. 22-CV-68 (LEK), 2022 WL 673863, at *7 (N.D.N.Y. Mar. 7, 2022)). So, for example, the "majority of circuits . . . have concluded that zoning laws which provide the opportunity for individualized variances are neutral laws of general applicability." *Illinois Bible*

*Colls. Ass'n v. Anderson*, 342 F.3d 752, 764-65 (7th Cir. 2003); *see also Fortress Bible Church v. Feiner*, 694 F.3d 208, 220 (2d Cir. 2012) (declining to reach the issue but noting the same and collecting cases).

Here, Plaintiffs argue that the LGBTQ Policy is not generally applicable first because of the variance provision in Rule 035, which allows DCF to "grant a variance from a specific rule upon its determination that the applicant or licensee will otherwise meet the goal of the rule." As Plaintiffs acknowledge, that rule does not apply to Rules 200, 201, or 315, which formed the primary bases for the Plaintiffs' license revocations, and that forecloses Plaintiffs from relying on it here. *See, e.g.*, *Bates*, 2023 WL 7546002, at *10-11 (declining to rely on exemption that did not apply to rules under which applicant was denied a license).

But in any event, the variance rule does not "invite[] the government to consider the particular reasons for a person's conduct," like the exemptions at issue *Fulton* and the cases on which its "exemption" reasoning is based. *See Fulton*, 593 U.S. at 534 (provision allowed commissioner to grant exemption "in his/her sole discretion"); *Sherbert v. Verner*, 374 U.S. 398 (1963) (provision denying unemployment benefits to those who had "failed, without good cause, to accept suitable work").[19] The variance rule here focuses on the "goal of the rule" for which the variance is sought, not the applicant's reasons for seeking the variance. In other words, unlike the discretionary and "good cause" exemptions at issue in *Fulton* and *Sherbert*, it doesn't matter for purposes of Rule 035 whether an applicant fails to comply with the Licensing Rule for religious or non-religious reasons—if the applicant cannot satisfy the "goal of the rule," their request for a

---

[19] *See also Fulton*, 593 U.S. at 534 ("Smith later explained that the unemployment benefits law in *Sherbert* was not generally applicable because the 'good cause' standard permitted the government to grant exemptions based on the circumstances underlying each application.").

variance will be denied. *See Rizzo*, 2024 WL 3274455, at *6 n.2 (distinguishing vaccine exemptions from the "standardless case-by-case system" at issue in *Fulton*).

Next, Plaintiffs argue that even if the variance rule is not enough, the LGBTQ Policy is still not generally applicable because it relies on "subjective and individualized inquiries," like whether families can show "[k]knowledge of child and adolescent development and the needs of children," and "sound judgment." Pls.' Mem. at 14. They say that "the problem is how the state applies its criteria—approving families with progressive ideas about child development while penalizing families with religiously informed views." *Id.* at 15.

But Plaintiffs have offered no evidence—or even *alleged* facts suggesting—that DCF has applied the LGBTQ Policy in a manner unevenly or in a manner that "penalizes families with religiously informed views." On the contrary, DCF has denied licenses to those who have expressed an unwillingness to support LGBTQ foster children for secular reasons, and has approved applicants who have expressed religious feelings about LGBTQ issues but have nonetheless committed to respecting and supporting children's identities. *See* Background, Part I.C, *supra*. And in any event, *Fulton* and *Lukumi* prohibit a discretionary system of *exemptions* that are used to base a decision on the *reasons* for a person's need for the exemption, not just any opportunity for the exercise of discretion and judgment in a set of rules. *See*, *e.g.*, *Lukumi*, 508 U.S. at 537 ("[B]ecause it requires an evaluation of the particular justification for the killing [of animals], this ordinance represents a system of 'individualized governmental assessment of the reasons for the relevant conduct.'") (quoting *Smith*, 494 U.S. at 884). The rules cited by Plaintiffs

do not do that—the focus is entirely on foster parents' *ability* to provide appropriate and supportive care, not the reasons why they can or cannot.[20]

Finally, Plaintiffs' "underinclusivity" argument, Pls.' Mem. at 15, fails for similar reasons. The variance provision here does not, like the ordinances at issue in *Fulton* and *Lukumi*, "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. On the contrary, the variance allows for exemptions only if an applicant can demonstrate that its proposed solution *serves* the state's asserted interests—or in the rule's parlance, that "the applicant or licensee will otherwise meet the goal of the rule." Licensing Rule 035. Nothing in *Fulton* or *Lukumi* held that a state cannot provide for variances allowing individuals to comply with a thrust of a particular rule through means not expressly contemplated by the rule itself. That is all the variance rule does here, and it does not run afoul of the First Amendment in doing so.

### D.  The LGBTQ Policy survives any level of scrutiny.

As discussed above, the LGBTQ Policy regulates only conduct, not speech; it does not burden Plaintiffs' free association rights; and it does not burden their free exercise of religion. Thus, the Court should apply rational basis review and conclude that the rule is constitutional as applied to Plaintiffs. For all the reasons discussed above, the Policy is, at a minimum, rationally related to the State's interest in protecting all children in the State's legal care and custody from harm, including LGBTQ children.

---

[20] Plaintiffs' criticism that the Department created a "freewheeling exemption" by placing a needy infant with the Gantts before their license had been formally issued, Pls.' Mem. at 15, is baseless. The Gantts' pre-placement application itself included an express agreement to comply with the Licensing Rules, without exception. Edmunds Dec. ¶ 26; Edmunds Dec. Ex. 1.

But even if intermediate or strict scrutiny were appropriate, the LGBTQ Policy satisfies either standard. The policy serves a compelling state interest and is "narrowly tailored" to serve that interest. *Friend v. Gasparino*, 61 F.4th 77, 91 (2d Cir. 2023) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218 (2015)).

1.      **The State's interest in protecting the well-being of children, and particularly those over which it exercises legal custody, is compelling.**

A state's interest in "safeguarding the physical and psychological well-being of a minor" is "compelling." *New York v. Ferber*, 458 U.S. 747, 756-57 (1982). "[T]he interests of society to protect the welfare of children, and the state's assertion of authority to that end," are "no mere corporate concern of official authority." *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944). "It is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed [adults] and citizens." *Id.* Accordingly, the Supreme Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Ferber*, 458 U.S. at 757.

And the State's interest is even more potent when it comes to protecting children in its own care and custody. Indeed, the State has a constitutional *obligation* to ensure that children in state custody placed in foster care are protected from harm. *See Southerland v. Giuliani*, 4 Fed. App'x 33, 37 (2d Cir. 2001) ("It is well-established that a child in foster care has a liberty interest to be free from harm, and correspondingly, that the state has a duty to protect such children from harm."); *Alford v. City of New York*, 413 F. Supp. 3d 99, 115 (E.D.N.Y. 2018) ("[I]f placed in foster care, children have a substantive due process right to protection from harm that is violated by professional caretakers when they substantially depart from accepted professional judgment, practice, or standards.") (cleaned up).

33

The LGBTQ Policy is grounded in years of both local and national studies and analysis demonstrating that LGBTQ children and young people are overrepresented in the foster care system and experience worse outcomes due to the lack of affirmation they receive. *See* Background, Parts I.B & II, *supra*. Another federal district court reviewing the research has found it confirms that "a disaffirming family environment can have a severe impact on LGBTQ+ youth." *Bates*, 2023 WL 7546002, at *21; *see also id.* ("[W]ith the research currently available, the government has presented sufficient evidence that a disaffirming home environment can negatively impact an LGBTQ+ youth's mental health and health outcomes" and that "an affirming home environment can mitigate the harm that other factors cause to an LGBTQ+ youth's mental health and outcomes."). The State's policy—which simply requires foster parents to affirm a child's sexual and gender identity—is designed precisely to address that harm.

The Policy does not, as Plaintiffs' argue, "harm" foster children by excluding non-affirming families. Pls.' Mem. at 17-18. True, not all children in state custody are LGBTQ, but the policy is designed to protect not only those children who openly identify as LGBTQ, but also those who have not yet come out, and those who have yet to develop those identities. And in any event, Plaintiffs do not cite any evidence supporting their startling suggestion that Vermont has "exclud[ed] over half of all adults from eligibility."  It may be true that "[s]ix-in-ten U.S. adults say that whether a person is a man or woman is determined by their sex at birth," Pls.' Mem. at 19, but that doesn't mean all six would nonetheless refuse to be affirming and supportive of their child's experiencing otherwise.[21]

The Policy also does not, as Plaintiffs claim, "exclude[] entire faith communities and many other caregivers whose beliefs do not accord with the state's." Pls.' Mem. at 18. Again, the

---

[21] It is also worth asking whether that "six-in-ten" figure reflects attitudes in Vermont.

Policy does not require foster parents to adjust their religious beliefs, nor does it require foster parents to withhold their thoughts and beliefs from every child who might come into their care; it simply requires them to agree to treat a child who *is* LGBTQ with acceptance and support, the same way it requires them to treat children of a different race or religious background respectfully. Thus, the Policy does not "take[] away [the] opportunity for children who share the Wuotis' and Gantts' religious views to find like-minded, faithful homes." *Id.* [22]

Next, the Policy is not "underinclusive," as Plaintiffs argue. Pls.' Mem. at 18. That the State does not disqualify foster parents who, for practical reasons, are unable to care for certain categories of children and allows foster parents to express "preferences" in the context of individual placements does not make the policy underinclusive. Again, the point here is the State—and many cases the child—will not know whether they are LGBTQ, and so similar exceptions would be senseless in this context. *See also* Argument, Part I.C.2, *supra* (rebutting Plaintiffs' arguments based on Rule 035's variance provision).

Finally, Plaintiffs meager attempt to rebut the extensive research outlined above regarding the harms posed to LGBTQ youth by non-acceptance, Pls.' Mem. at 19, is unavailing. To make the case that affirmation is *not* as important to an LGBTQ child's well-being, Plaintiffs cite a single study conducted for the National Health Service in England. The report has been much debated,[23] but in any event, the report focuses on medical interventions, which are covered primarily by other provisions in the licensing rules and are not at issue in this case. *See* Hilary

---

[22] *See also,* Caitlin Ryan, *Parents Don't Have To Choose Between Their Faith and Their LGBT Kids,* Commentary, Wash. Post (Jan. 7, 2015), https://perma.cc/994R-G97G (explaining ways to help "[f]amilies that are struggling . . . understand that they don't have to choose between their LGBT child and their faith" emphasizing "key religious values of respect, mercy and compassion").

[23] *See, e.g.,* Meredith McNamara *et al.*, *An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria,* at https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf (group of Yale professors, researchers, and clinicians disputing some of Ms. Cass's conclusions).

Cass, *The Cass Review: Independent Review of Gender Identity Services for Children and Young People: Final Report* at 74-75 (April 2024) (discussing scope of the review). Moreover, the Cass Review does not contradict the LGBTQ Policy's central premise that sexual and gender identity are fluid and that acceptance and support of a child's identity are critical to mental health. *See*, *id.* at 98-99 (discussing the development of gender role behaviors and identity).

> ## 2.     The LGBTQ Policy is narrowly tailored.

"Narrow tailoring requires that the restriction on speech be '*necessary* to serve the asserted compelling interest, ... precisely tailored to serve that interest, and ... the least restrictive means readily available for that purpose.'" *Friend*, 61 F.4th at 91 (quoting *Hobbs v. County of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005)).

As explained above, the need for acceptance is particularly acute in the foster care population, given the heightened prevalence of LGBTQ youth in foster care, the heightened vulnerability of that group, and the substantial negative outcomes that rejection causes. Although some children and young adults will self-identify as LGBTQ, many will not. Evidence demonstrates that it is not possible for DCF to know or reasonably predict which child is or will prove to be LGBTQ. The District of Oregon recognized this problem: "Here, the government has provided proof that LGBTQ+ youth are overrepresented in the foster care system and that children in the age range that plaintiff seeks to adopt usually have not yet developed a diverse sexual orientation or gender identity even if they may do so in the future." *Bates*, 2023 WL 7546002, at *26. The only way, therefore, to ensure foster youth in DCF custody are not subject to the harms of identity rejection is to require that any licensed foster parent be willing to respect, accept, and support a youth's LGBTQ identity if the youth placed with them develops into an LGBTQ person. Thus, the LGBTQ Policy aims to ensure that all foster parents are willing and

able to provide a safe and affirming home and do not burden any more activity than necessary to meet that end.

Because it is not possible to know which children are or will be LGBTQ it is impossible, as Plaintiffs suggest, to simply not place LGBTQ youth with foster families who cannot be affirming of the youth's identity. Indeed, that would exacerbate the problem, rather than solve it. If DCF were willing to license foster families and place youth with those families despite open rejection of LGBTQ identities, youth involved in the foster care system would reasonably be more fearful of possible rejection and less likely to come forward to DCF or their foster caregivers regarding their developing sexual or gender identity.

It is both having the youth's identity rejected as well as the fear that it would be rejected by those entrusted with the youth's care that causes demonstrated harm to the emotional and mental health of the youth. If, as suggested by Plaintiffs, upon coming forward with their LGBTQ identity the youth were simply given back to DCF that would subject the youth to harm. Fundamentally, there is *no* harmless way for *any* child, LGBTQ or otherwise, to be removed from their home because their caregiver will not accept who the child is. Such an outcome is precisely what the Policy is designed to avoid and demonstrates why the Policy is narrowly tailored. The "alternative methods" proposed by Plaintiffs compromise the wellbeing of LGBTQ youth in the State's custody. The LGBTQ Policy is the State's only alternative.

## II. The LGBTQ Policy is not unconstitutionally vague.

"A law may be unconstitutionally vague as applied to the conduct of certain individuals if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186-87 (2d Cir. 2010) (quotation omitted). The relevant inquiry is "whether the language conveys sufficiently definite

warning as to the proscribed conduct when measured by common understanding and practice." *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008). The text need not be mathematically precise. *Grayned v. City of Rockford*, 408 U.S. 104 (1972). The degree of uncertainty permitted is higher for laws with civil—as opposed to criminal—consequences. *See Reynolds v. Quiros*, 25 F.4th 72, 96 (2d. Cir. 2022). And more vagueness is tolerated in circumstances where "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Nat'l Inst. of Family & Life Advocates v. Clark*, No. 2:23-cv-229, 2024 WL 3027983, *13 (D. Vt. 2024).

The licensing scheme at issue here is both broad and direct. While Rules 201.2 (requiring foster parents to "have knowledge of child and adolescent development and the needs of children") and 301 (requiring them to "meet the physical, emotional, and developmental needs . . . in accordance with the child's case plan") are necessarily broad, they are illuminated by very specific non-discrimination provisions in the rules. *See* Rules 200, 201.10, & 315. What it means to be affirming or accepting of an LGBTQ child's identity is not so vague that a person of ordinary intelligence—and particularly someone seeking a license to become a foster parent to a vulnerable child—would not know what the Rules require. *See Libertarian Party of Erie Cty. v. Cuomo*, 970 F.3d 106, 126 (2d Cir. 2020) (collecting cases finding general standards such as "good cause," "good moral character," and "proper cause" were not void for vagueness in Second Amendment context); *see also Clavin v. Cty. of Orange*, 38 F. Supp. 3d 391, 398 (S.D.N.Y. 2014) (rejecting vagueness challenge to licensing scheme, recognizing that assessing license applicant's qualifications is an "inherently individualized and fact-specific inquiry").

The record also reflects a rigorous process through which Plaintiffs could have further clarified the meaning of the Licensing Rules, numerous freely available resources, training from

the very office applying the Rule, and DCF staff actively clarifying its meaning. *See* Declaration of Kaitlyn Wuoti ¶¶ 33-37; Declaration of Michael Gantt at 4, 9; Pls.' Mot. Ex. E at 7-12; *see generally* Pls.' Mot. Ex. B-E; Pls.' Mot. Ex. K; Pls.' Ver. Compl. Ex. D. This was an open, explanatory process; DCF wants to help applicants understand why these things matter. *See* Edmunds Dec. ¶¶ 12-15. And foster parents can challenge and seek clarification of the regulations through an administrative appeal process. *See* Rules 042-043 (describing appeals process).

Plaintiffs acknowledge that the Foster Licensing Rules are fundamentally about "good parenting." Pls.' Mem. at 23. Through the LGBTQ Policy, DCF has made it crystal clear that for purposes of those seeking to "parent" children in its custody, "good parenting" includes being accepting of an LGBTQ child's sexual and gender identity. The LGBTQ policy is not unconstitutionally vague.

## III. The remaining injunction factors favor denial of preliminary injunctive relief.

Plaintiffs cannot establish that they will suffer irreparable harm in the absence of a preliminary injunction. They rely on the alleged unconstitutionality of the LGBTQ Policy to establish irreparable harm. But "[i]n the Second Circuit [the] presumption of irreparable harm arising from a constitutional violation is not automatic." *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 207 (S.D.N.Y. 2023). Thus, even in constitutional cases it is often "more appropriate to determine what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997). Plaintiffs' reliance only on the alleged constitutional violation does not establish irreparable harm.

On the other hand, irreparable harm to others *would* likely result from the injunction requested by Plaintiffs, in that DCF would be forced to place children with foster parents who refuse to support a child's sexual or gender identity. As discussed in detail above, the harms associated with that type of rejection can be permanent and substantial. The LGBTQ rule itself is designed to prevent that sort of rejection. Barring application of the policy would inflict irreparable harm on the children in DCF's care. For the same reasons, the balance of equities and the public interest therefore also support denial of injunctive relief.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction.

Dated at Burlington, Vermont, this 29th day of July, 2024.

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

By:     */s/ Jonathan T. Rose*
Jonathan Rose
Solicitor General
Ryan Kane
Deputy Solicitor General
Patrick Gaudet
Assistant Attorney General
109 State Street
Montpelier, VT 05609
(802) 793-1646
jonathan.rose@vermont.gov
ryan.kane@vermont.gov
patrick.gaudet@vermont.gov

Counsel for Defendants Christopher Winters, Aryka Radke, and Stacey Edmunds