## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT
## WINDHAM DIVISION

| | |
|---|---|
| **BRIAN WUOTI**; **KAITLYN WUOTI**; **MICHAEL GANTT**; and **REBECCA GANTT**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **CHRISTOPHER WINTERS**, in his official capacity as Commissioner of the Vermont Department for Children and Families; **ARYKA RADKE**, in her official capacity as Deputy Commissioner of the Family Services Division; and **STACEY EDMUNDS**, in her official capacity as Director of Residential Licensing & Special Investigations, <br><br> *Defendants*. | Case No. 2:24-cv-614 <br><br><br><br><br> **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ II

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 2

    I.    Vermont's Mandate violates Plaintiffs' First Amendment rights. ................ 2

        A.  The Mandate regulates speech, not conduct. ............................................... 3

        B.  The Mandate regulates expressive association. .......................................... 8

        C.  The Mandate is not generally applicable or neutral. .................................. 9

        D.  The Mandate flunks any level of heightened scrutiny. ............................ 15

    II.    The Mandate is vague. ..................................................................................... 29

    III.  The remaining factors favor an injunction. .................................................... 30

CONCLUSION ......................................................................................................... 30

CERTIFICATE OF SERVICE ..................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ........................................................................ 1, 3, 4

*Am. Amusement Mach. Ass'n v. Kendrick,*
   244 F.3d 572 (7th Cir. 2001) .................................................................. 25

*Americans for Prosperity Foundation v. Bonta,*
   594 U.S. 595 (2021) ............................................................................. 8

*Axson-Flynn v. Johnson,*
   356 F.3d 1277, (10th Cir. 2004) .............................................................. 12

*Bates v. Pakseresht,*
   2023 WL 7546002 (D. Or. Nov. 14, 2023)........................................... 4, 10, 21

*Blais v. Hunter,*
   493 F. Supp. 3d 984  (E.D. Wash. 2020).......................................................... 10

*Brown v. Entertainment Merchants Association,*
   564 U.S. 786 (2011) ...................................................... 14, 21, 22, 28

*Burke v. Walsh,*
   2024 WL 3548759 (D. Mass. June 5, 2024)............................................. 10, 12

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
   868 F.3d 104 (2d Cir. 2017) ................................................................ 20

*Clapper v. Amnesty International USA,*
   568 U.S. 398 (2013) .......................................................................... 21

*Clavin v. County of Orange,*
   38 F. Supp. 3d 391 (S.D.N.Y. 2014)........................................................ 29

*Cohen v. California,*
   403 U.S. 15 (1971) ............................................................................. 5

*Cornelio v. Connecticut,*
   32 F.4th 160 (2d Cir. 2022).................................................................. 21

*Doe 2 v. Shanahan,*
   917 F.3d 694 (D.C. Cir. 2019) ............................................................... 18

Reply in Support of Motion for Preliminary Injunction

*FEC v. Cruz,*
    596 U.S. 289 (2022) ............................................................ 26

*FEC v. Wisconsin Right To Life, Inc.,*
    551 U.S. 449 (2007) ............................................................ 24

*Fellowship of Christian Athletes v. San Jose Unified School District Board of
    Education,*
    82 F.4th 664 (9th Cir. 2023) ................................... 11, 14

*Frisby v. Schultz,*
    487 U.S. 474 (1988) ............................................................ 19

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ............................... 9, 11, 13, 16, 17

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490 (1949) ............................................................. 4

*Greater New Orleans Broadcasting. Association, Inc. v. United States,*
    527 U.S. 173 (1999) ............................................................ 18

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ................................................................. 3

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ...................................................... 3, 4, 7

*Illinois Bible Colleges Association v. Anderson,*
    870 F.3d 631 (7th Cir. 2017) ............................................ 12

*In re Adoption of E,*
    279 A.2d 785 (N.J. 1971) .................................................. 13

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) ........................................................ 9, 12

*Libertarian Party of Erie County v. Cuomo,*
    970 F.3d 106 (2d Cir. 2020) ............................................. 29

*Masterpiece Cakeshop v. Colorado Civil Rights Commission,*
    584 U.S. 617 (2018) ............................................................ 24

*Matal v. Tam,*
    582 U.S. 218 (2017) ............................................................. 4

Reply in Support of Motion for Preliminary Injunction

*McCullen v. Coakley,*
    573 U.S. 464 (2014) .................................................................... 20, 23

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ............................................................ 3

*New Hope Family Services, Inc. v. Poole,*
    966 F.3d 145 (2d Cir. 2020) ........................................................ 7, 12

*Palmore v. Sidoti,*
    466 U.S. 429 (1984) ...................................................................... 28

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) .................................................................... 5, 19

*Rizzo v. New York City Department of Sanitation,*
    2024 WL 3274455 (S.D.N.Y. July 2, 2024) ...................................... 12

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984 ........................................................................ 8

*Rubin v. Garvin,*
    544 F.3d 461 (2d Cir. 2008) ......................................................... 30

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,*
    547 U.S. 47 (2006) ......................................................................... 4

*Slattery v. Hochul,*
    61 F.4th 278 (2d Cir. 2023) ............................................................ 7

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ....................................................................... 14

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000). ..................................................................... 22

*Video Software Dealers Association v. Schwarzenegger,*
    556 F.3d 950 (9th Cir. 2009) ......................................................... 27

*Virginia v. Black,*
    538 U.S. 343 (2003) ........................................................................ 5

*Waln v. Dysart School District,*
    54 F.4th 1152 (9th Cir. 2022) ....................................................... 11

*We The Patriots USA, Inc. v. Hochul,*
    17 F.4th 266 (2d Cir. 2021) ............................................... 12, 15, 17

*We The Patriots USA, Inc. v. Hochul,*
    17 F.4th 368 (2d Cir. 2021) ......................................................... 12

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943) ...................................................................... 16

*Williams v. Annucci,*
    895 F.3d 180 (2d Cir. 2018) ................................................ 13, 16, 22

## Other Authorities

Caitlin Ryan & Robert Rees, S.F. State Univ., Family Acceptance Project,
    *Supportive Families, Healthy Children* (2012) .......................... 25, 26

Caitlin Ryan et al., *Family Acceptance in Adolescence and the Health of*
    *LGBTQ Young Adults,*
    23 J. of Child & Adolescent Psychiatric Nursing 205 (Nov. 2010)................. 25

Caitlin Ryan, *Parents Don't Have To Choose Between Their Faith and Their*
    *LGBT Kids*, Wash. Post (Jan. 7, 2015).................................... 2, 26, 27

Catherine Gimbrone et al., *The Politics of Depression: Diverging Trends in*
    *Internalizing Symptoms Among US Adolescents by Political Beliefs,*
    2 SSM Mental Health 100043 (2022) .......................................... 28

David M. Smolin, *Kids Are Not Cakes: A Children's Rights Perspective on*
    *Fulton v. City of Philadelphia,*
    52 Cumb. L. Rev. 79 (2022).......................................................... 17

Diana van Bergen et al., *Moral Dilemmas in Foster Care Due to Religious*
    *Differences Between Birth Parents, Foster Parents, and Foster*
    *Children,*
    40 Child and Adolescent Social Work J. 811 (2022) ....................... 13

Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception,*
    101 Cornell L. Rev. 981 (2016) ...................................................... 5

Hilary Cass, *The Cass Review: Independent Review of Gender Identity*
    *Services for Children and Young People: Final Report* (April 2024)......... 24, 28

James S. Morandini et al., *Is Social Gender Transition Associated with*
    *Mental Health Status in Children and Adolescents with Gender*
    *Dysphoria?,*
    52 Archives of Sexual Behav. 1045 (2023) ................................... 28

Ruth Hall et al., *Impact of Social Transition in Relation to Gender for Children and Adolescents: A Systematic Review*, Archives of Diseases in Childhood (Apr. 9, 2024)............................................. 28

Stephen B. Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, 48 J. of Sex & Marital Therapy 706 (Mar. 17, 2022) ....................................... 25

U.S. Gov't Accountability Off., GAO-22-104688, Foster Care: Further Assistance from HHS Would be Helpful in Supporting Youth's LGBTQ+ Identities and Religious Beliefs 49 (2022) ....................................... 14

Vermont's Office of the Child, Youth and Family Advocate, 2023 Annual Report to the Governor and General Assembly 23 (Dec. 26, 2023)................. 17

Ying Chen & Tyler J. VanderWeele, *Associations of Religious Upbringing With Subsequent Health and Well-Being From Adolescence to Young Adulthood: An Outcome-Wide Analysis*, 187 Am. J. of Epidemiology (Issue 11) 2355 (2018) ........................................ 28

## Regulations

89 Fed. Reg. 34,818 (April 30, 2024) .................................................................. 22, 23

Vermont Department for Children and Families, Family Services Division, Licensing Rules for Foster Homes in Vermont (May 2023) ........ 1, 6, 10, 15, 19

Reply in Support of Motion for Preliminary Injunction

## INTRODUCTION

Vermont officials recently emailed foster families lamenting the "placement crisis" in its foster system. Pls.' Mem. Supp. Prelim. Inj. ("MPI"), Ex. L at 2, Doc. 17-17. They do "not have enough homes … to fill the need," and the State has supposedly "exhausted all … possibilities." *Id.* But loving families like the Wuotis and the Gantts stand ready to help. Vermont just won't let them. Because of their religious views about human sexuality, Vermont won't let them care for *any* child of *any* religious affiliation of *any* age of *any* identity for *any* length of time. Vermont deems these long-held religious views so harmful that it prefers to leave vulnerable kids without homes than let the Wuotis and the Gantts care for them. This harms children, contradicts common sense, and violates the Constitution.

As to free speech, Vermont concedes that its policies require foster parents "to say or refrain from saying certain things" but calls this merely incidental to the regulation of conduct. Defs.' Mem. Opp'n Prelim. Inj. 22, Doc. 26 ("Opp'n"). The Supreme Court disagrees. It has held "time after time" that compelling speech "on weighty issues" like gender ideology is "no mere 'incidental' infringement on First Amendment rights." *303 Creative LLC v. Elenis*, 600 U.S. 570, 599–600 (2023) (cleaned up). Under Vermont's speech-is-conduct logic, states could tweak their policies to compel or restrict *any speech* by foster parents—whether banning pro-LGBT views, requiring LGBT applicants to use children's biology-based pronouns, or restricting any criticism of Palestine (or Israel). No court has ever given the government a blank check like this.

As to free exercise, Vermont defends its policy as neutral and generally applicable, but it has a formal mechanism for granting exemptions and uses subjective, standardless criteria like "sound judgment" that renders the entire system one big individualized assessment. Rule 201.5, *Licensing Rules for Foster Homes in Vermont* ("Rules"), https://perma.cc/VZ7U-ZCLD. While Vermont frames

Reply in Support of Motion for Preliminary Injunction

its policies as products of a yearslong "data-driven" process (at 28), this process actually produced different policies that allowed accommodations and didn't require parents to compromise their beliefs. Vermont only later changed its policies to categorically exclude families who disagreed with its views.

Vermont cannot justify this about-face. Many children could thrive with families like the Wuotis and the Gantts. And though Vermont cites studies purporting to describe the harms of rejecting LGBT children, those studies don't apply here where the Wuotis and Gantts will not reject any LGBT child. Vermont's own cited experts agree that "religiously conservative" families can "support their LGBT children" *without* accepting ideas or behaviors "they don't condone."[1] In fact, the Biden administration recently reviewed the same studies and concluded that agencies *should* accommodate religious caregivers, not exclude them.

In short, only Vermont seems to think it must impose an ideological litmus test on controversial LGBT-related issues as a prerequisite for "good parenting." Opp'n 39. The countless children in Vermont's foster system disagree. They just want a loving home. This Court should grant Plaintiffs' requested injunction and put a stop to Vermont's harmful and unconstitutional policy.

## ARGUMENT

Plaintiffs deserve immediate relief because (I) Vermont's policies violate the First Amendment, (II) are unconstitutionally vague, and (III) the remaining factors favor an injunction.

## I.   Vermont's Mandate violates Plaintiffs' First Amendment rights.

Vermont's challenged policies ("Mandate") infringe Plaintiffs' free-speech, expressive-association, and free-exercise rights and fail any level of heightened scrutiny.

---

[1] Caitlin Ryan, *Parents Don't Have To Choose Between Their Faith and Their LGBT Kids*, Wash. Post (Jan. 7, 2015), https://perma.cc/994R-G97G.

### A.   The Mandate regulates speech, not conduct.

1. The Wuotis and the Gantts want to speak consistently with their religious beliefs about human sexuality. They want to say that biological sex is immutable, avoid using words like chosen pronouns to communicate that gender is fluid, and share their beliefs with their children in a loving, respectful, and age-appropriate manner. MPI 8–9. Both "oral utterance and the printed word" are pure speech protected by the First Amendment. *303 Creative*, 600 U.S. at 587 (cleaned up).

Vermont counters (at 21) that this speech becomes conduct when spoken by foster parents and regulated by Vermont. That's wrong. A law *facially* regulating conduct still affects speech when it's *applied* to "alter the [speaker's] expressive content," *Hurley v. Irish- Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995), or when "the conduct triggering coverage … consists of communicating a message," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).

Start with compelled speech. Vermont concedes (at 22) that it requires "Plaintiffs to say or refrain from saying certain things, like respecting a child's chosen pronouns.…" But "[p]ronouns can and do convey a powerful message" about human sexuality. *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). And while Plaintiffs will happily love any child regardless of how they identify, Plaintiffs don't want to use these words that contradict their beliefs. MPI 8. As a result, the Department revoked their licenses, citing their inability to verbally "encourage and support" children in these ways. MPI, Ex. E at 9, Doc. 17-10 ("Wuoti Emails").

The Mandate also restricts speech. MPI 9 (explaining this). For example, the Wuotis want to share "honestly how Jesus has changed" them and how Kaitlyn grew out of her struggles with gender dysphoria to encourage a child to cherish their body. Wuoti Emails 10. This, too, made the Wuotis "ineligible for renewal." *Id.* at 9. "Plaintiffs want to speak …, and whether they may do so … depends on what they say." *Holder*, 561 U.S. at 27. If speech about sexual-orientation, gender-

Reply in Support of Motion for Preliminary Injunction

identity, and gender expression ("SOGIE") isn't categorically and "holistically affirming," it's too critical for Vermont. *E.g.*, Opp'n 25. This selective standard shuts down certain views. *Matal v. Tam*, 582 U.S. 218, 246 (2017).

It does not matter that the Mandate's "central focus" is conduct. Opp'n 21–22. The public-accommodation law in *Hurley* did "not, on its face, target speech." *Hurley* 515 U.S. at 572, 578 (explaining the "ultimate point" was prohibiting discrimination). Similarly, the law in *303 Creative* facially regulated conduct but still compelled speech when applied to alter words and images on websites. 600 U.S. at 596–99. "[F]orc[ing] an individual to utter what is not in her mind about a question of political and religious significance" is much more than "an incidental burden on speech." *Id.* at 596 (cleaned up) (*distinguishing Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 62 (2006)).

Vermont invokes *Bates v. Pakseresht* (at 22), but that case helps Plaintiffs. No. 2:23-cv-00474, 2023 WL 7546002, at *1 (D. Or. Nov. 14, 2023). The policy in *Bates* (like Vermont's) required "a supportive environment for" children, banned espousing "disaffirming or negative views about a child's LGBTQ+ identities," and compelled certain pronouns. *Id.* at *17. While the district court thought this policy *facially* regulated conduct, the court still agreed it compelled and restricted speech *in application*. *Compare id.* at *17–18, *with* Opp'n 21 (explaining Policy 76 ensures "a safe, healthy, and inclusive environment"). The Mandate operates the same way.

2. Vermont (at 22) also gestures to the speech-integral-to-illegal-conduct doctrine, which applies where conduct is "in part … carried out" through speech. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). But this exception applies to words that are used to achieve an illegal act, like speech conspiring to illegally restrain trade, *id.* at 502, and speech "discriminating in hiring," *FAIR*, 547 U.S. at 62. The law regulates these words to achieve a "separately identifiable" illegal act, not to punish the message they convey. *Cohen v. California*, 403 U.S. 15,

18 (1971); Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 1011 (2016) (state cannot label "speech itself" illegal; "[r]ather, it must help cause or threaten *other* illegal conduct").

As Vermont lets slip, its Mandate applies because it bans "certain views" (at 22) conveyed by words, not a separately identifiable act. Vermont may argue that it targets harmful conduct that allegedly flows from Plaintiffs' speech. But "[t]he First Amendment cannot be evaded that easily." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 393 (1992). Regulations aimed at harms "caused by a distinctive idea, conveyed by a distinctive message" are aimed at ideas. *Id.* at 393.

None of this handicaps Vermont. *Contra* Opp'n 22. Vermont can regulate "intimidating language" (at 22) as "a type of true threat" outside of First Amendment protection. *Virginia v. Black*, 538 U.S. 343, 360 (2003). Or Vermont could seek to regulate by form, "mode," and manner to prohibit vulgar, rude, or impolite speech, so long as it is not targeting "the underlying message expressed." *R.A.V.*, 505 U.S. at 386. Barring all else, Vermont could try to overcome strict scrutiny. But Vermont cannot categorically exclude applicants from expressing certain views no matter their form, context, or mode. That is regulating speech based on viewpoint.

3. To be sure, Vermont tries to sugarcoat its policies with a litany of vague buzzwords, claiming that Plaintiffs supposedly "overstate the significance of their personal beliefs" (at 25); need not "express … agreement with the policy," or "abandon" or "adjust their beliefs" (at 23, 35); must only "treat a child … with acceptance and support" (at 35); cannot "reject or diminish any aspect of a child's identity" (at 25); share certain views "in [an] unsupportive manner" (at 24); or try "to impose certain views on a child" (at 22). And Vermont says that Plaintiffs need only support a child's gender identity like they support a child's religion: without

5

Reply in Support of Motion for Preliminary Injunction

"having to compromise their own beliefs … even if they are prevented from discouraging the child's faith." Opp'n 23 n.17; *see also* Opp'n 22.[2]

But the slogans flounder on the record. Beliefs about SOGIE require affirmation, not just respect. Vermont decertified Plaintiffs even though they will love and respect any child, regardless of how the child identifies or what the child believes. Decl. Michael Gantt Supp. Prelim. Inj. ¶¶ 130, 135–37, 142–51, Doc. 17-4 ("Gantt Decl."); Decl. Kaitlyn Wuoti Supp. Prelim. Inj. ¶¶ 107–13, 119–20, Doc. 17-3 ("Wuoti Decl."). Plaintiffs would never "denigrate," disparage, or mistreat any child. Gantt Decl. ¶ 149; Wuoti Decl. ¶¶ 112, 119. Rather, the Mandate requires applicants to affirm ideas they don't believe in violation of their "divergent personal opinions or beliefs." V. Compl. ("Compl."), Ex. D at 2, Doc. 1-4 ("Sept. 8 Email"). Compelling pronouns is one way. Requiring applicants to verbally "support children in wearing hairstyles, clothing, and accessories affirming of the child's … gender identity" is another. Rule 315. Indeed, Vermont revoked the Wuotis' license because they couldn't "encourage" a child to reject their physical body. Wuoti Emails at 9. And Vermont revoked the Gantts' license after they explained that they would love "any child," but just could not affirm things they did not believe. MPI, Ex. D at 3–4, Doc. 17-9. Vermont just wants it both ways: saying it requires respectfulness that does not force anyone to say anything, while insisting that affirming Vermont's views about gender ideology is just "good parenting." Opp'n 39.

In other places, Vermont suggests that even if it regulates Plaintiffs' speech, Plaintiffs can freely speak "with others" outside the home. Opp'n 25. On this theory (at 23–24), Plaintiffs need not "hide [their beliefs] from the public"—they just need to hide them from their kids. But telling Rev. Wuoti and Rev. Gantt to preach one

---

[2] That parents can respect and support a child's religious beliefs without compromising their conscience reveals Vermont's inconsistent application of its Rules. *Infra* 13–14.

Reply in Support of Motion for Preliminary Injunction

message from the pulpit while they promote the opposite message as parents would make them "hypocrites" in their own homes and in public. *Slattery v. Hochul*, 61 F.4th 278, 290 (2d Cir. 2023) (cleaned up) (rejecting similar argument); *Hurley*, 515 U.S. at 574, (explaining speaker's autonomy to "shape its expression by speaking on one subject while remaining silent on another").

The ability to speak elsewhere is no answer in a case like this. In *New Hope Family Services, Inc. v. Poole*, New York tried that move, saying the Christian adoption agency was "free to espouse its beliefs about marriage and family … *outside* the contours of its … adoption services." 966 F.3d 145, 176 (2d Cir. 2020) (cleaned up). But "that concession [was] meaningless" because the agency wanted to speak about its beliefs while continuing to provide adoption services. *Id.*

Vermont tries to distinguish *New Hope* by arguing (at 23) that the Christian agency exercised "considerable discretion" in placing children, while foster parents do not have the same discretion when they parent. But foster parents exercise discretion all the time. *See New Hope*, 966 F.3d at 151 (noting the agency was subject to a "thicket of regulations" but also exercised much discretion). Vermont's Rules "are necessarily broad" because parents can't press pause to consult Vermont for every daily parenting decision. Opp'n 38.

Besides, Vermont never explains why discretion is relevant or required for foster parents to exercise their First Amendment rights. In *New Hope*, the adoption agency's discretion helped to show that the agency spoke for itself, not the government. 966 F.3d at 175. Here, the Department never argues that foster parents speak for Vermont. Nor could it, for all the reasons *New Hope* laid out when rejecting this argument. *Id.* at 174–75. "[T]he mere fact that government authorizes, approves, or licenses certain conduct does not transform the speech engaged therein into government speech." *Id.* at 171.

Nor does *New Hope*'s procedural posture detract from its reasoning. *New Hope* held that the adoption agency's allegations stated a plausible claim for relief. And this case is easier than *New Hope* because it involves only words, i.e.*,* pure speech. Just as forcing an adoption agency to certify same-sex couples plausibly compels the agency to communicate views it disagrees with, so does forcing individuals to speak literal words conveying objectionable ideas. *New Hope* controls here.

### B.  The Mandate regulates expressive association.

The Wuotis and the Gantts want to associate with their churches while avoiding events like pride parades. MPI 11–13. But to foster, they must attend events like pride parades while avoiding events at their churches. *Id*. That severely burdens their right to expressive association.

First, Vermont tries (at 24) to limit this right to groups that want to exclude someone. But this right also protects people "denied benefits" based on their desire to affiliate with certain groups. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (noting infringement "'can take a number of forms,'" such as withholding benefits because someone belongs to the wrong political party (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). So it is no answer to tell Plaintiffs (at 25) that they can speak about their beliefs and attend church with "others." They want to attend church as a family *and* avoid events to which they object. Conditioning the license on forfeiting these rights is the burden.

Next, Vermont says (at 25) that its policy's "terms" don't require applicants to associate or not associate with anything, only to meet children's basic needs. But this merely repeats Vermont's conduct-is-speech confusion, focusing on what its policy facially regulates rather than what it regulates as applied. *Supra* § I.A. After all, Vermont *already* disqualified the Wuotis and the Gantts from fostering, and one reason was their inability to attend pride parades. MPI, Ex. D at 2.

8

To be sure, Vermont tries to backtrack now, saying pride-parade attendance was an "example" of being "holistically affirming," not a requirement, and families need not "withhold their thoughts and beliefs from *every* child who might come into their care." Opp'n 25, 35 (emphasis added). But Vermont can't un-ring the bell now, "*post hoc.*" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (cleaned up). And even still, Vermont concedes (at 25) that its policy requires that applicants not "diminish any aspect of a child's identity[.]" That means Plaintiffs can't attend church events where their kids will hear religious views about how God created each person male or female. Plaintiffs made clear many times over that they would never reject or diminish any child. *Supra* 6, *see also* Second Decl. Michael Gantt Supp. Prelim. Inj. ¶¶ 3–6, Doc. 37-3; Second Decl. Kaitlyn Wuoti Supp. Prelim. Inj. ¶¶ 7–21, Doc. 37-2 ("Second Wuoti Decl."). Yet Vermont categorically excluded them and defends that exclusion now. Vermont could always allow Plaintiffs into the system, knowing they only want to stay true to their faith. But Vermont refuses.

### C.     The Mandate is not generally applicable or neutral.

1. A policy is not generally applicable if it 1) provides "a mechanism for individualized exemptions" or 2) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021) (cleaned up). As already explained, Rule 35 provides a "formal mechanism for granting exceptions" parallel to the provision condemned in *Fulton*. MPI 14. It also facially applies to Rule 301, which was used to revoke the Wuotis' and the Gantts' licenses. MPI, Exs. C, D. The State places children in unlicensed homes too. MPI 15. That's all this Court needs to find that the policy is not generally applicable.

Vermont resists this conclusion, arguing that Rule 35 does not allow variances for Rules 201 and 315. But making exemptions to the vast majority of

Reply in Support of Motion for Preliminary Injunction

Rules, while demanding strict conformity to three of them, makes the system hopelessly underinclusive. MPI 15 (explaining that officials can exempt requirements related to safety and discipline). And besides, Rules 201 and 315 already involve "standardless, case-by-case system[s]." Opp'n 31; MPI 14–15 (explaining this). Presumably, every parent thinks they exercise "sound judgment" (Rule 201.2), so requesting an exemption from this provision is meaningless.

*Burke v. Walsh* is helpful. Civil Action No. 23-11798, 2024 WL 3548759, at *1 (D. Mass. June 5, 2024). There, the state excluded a Catholic family from foster care, much like Vermont excluded the Wuotis and the Gantts. *Id.* at *7. The rule there was nearly identical to Rule 201: requiring parents "to promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity." *Id.* (cleaned up). The district court held that it was "clearly established" that using this type of "subjective criteria" was not generally applicable under *Fulton. Id.* And the district court in *Blais v. Hunter* similarly agreed that "holistic assessment[s]" like Vermont's are not generally applicable. 493 F. Supp. 3d 984, 999 (E.D. Wash. 2020).

*Bates* provides no refuge for Vermont. There, the district court found that a rule applicable to *all* foster parents was not undermined because the rule did not apply to adoptions *outside* of foster care. *Bates*, 2023 WL 7546002, at *11. So there, the court (wrongly) said a different rule in a different context implicated different interests. But here, Vermont's policies allow exemptions in the same context (foster care), all of which implicate the same interest: promoting the welfare of children in foster care. Vermont's system is more like the one in *Burke*.

Vermont also argues that placing children in unlicensed homes is no big deal because families self-certify to follow the Rules before they accept emergency placements. Opp'n 32 n.20. But this system still exempts applicants from doing what Vermont now requires. In other words, parents who self-certify do not *in fact*

Reply in Support of Motion for Preliminary Injunction

need to bend their speech as Vermont demands; they just need *to say* they comply with vague standards. Indeed, Vermont placed a child with the Gantt family mere days after they applied to become foster parents. Gantt Decl. ¶¶ 32–37; *see also* Wuoti Decl. ¶ 45. Other foster parents can do the same, even when they will not (for example) use inaccurate pronouns. That Vermont *does nothing* to check or ensure policy compliance in countless situations is a concession, not a defense. Vermont's selective, look-the-other-way approach undermines its interests as well as the policy's general application. *See Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022) (school's failure to consistently enforce dress code rendered policy not generally applicable).

Vermont seeks to salvage its exemption system by insisting (at 30) that it "focuses on the 'goal of the rule' … not the applicant's reasons for seeking the variance." But the problem with discretionary assessments is the discretion itself. *Fulton* did not hinge on whether an exemption was "based on *the circumstances* underlying" a request or the formal reasons for requesting one because Philadelphia had not granted any exemptions at all. 593 U.S. at 534 (emphasis added); *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.* ("*FCA*"), 82 F.4th 664, 687 (9th Cir. 2023) (exemptions to nondiscrimination rule based on "equity policy" focused on student's needs made policy not generally applicable).

Here, it's also implausible to distinguish between the "goal of the rule" and "the applicant's reasons for seeking the variance." Opp'n 30. Look at Vermont's own policies. Vermont exempts parents who can't "care for certain categories of children" based on "practical reasons." Opp'n 35. And neither is Vermont concerned about parents who "express 'preferences' in the context of individual placements." *Id.* Whether these exemptions occur at the certification or child-placement stage, they are akin to "good cause" provisions: sanctioning some reasons for declining to care for children while disapproving others. *Fulton*, 593 U.S. at 535; *cf. New Hope*, 966

F.3d at 171 (explaining that Christian agency's certification of foster parents allowed it to "speak" about a child's best interests at the placement stage).

True, exemption mechanisms that provide "no meaningful discretion" *can* be generally applicable. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 289 (2d Cir. 2021), *clarified*, 17 F.4th 368 (2d Cir. 2021). But underinclusivity is still a concern. *Infra* 13–14. In any event, Vermont's Mandate does not provide "express exceptions for objectively defined categories of persons." *We The Patriots*, 17 F.4th 266, 288–89 (cleaned up); *accord Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) (explaining exemptions don't undermine general applicability if they involve a "limited yes-or-no inquiry"). Instead, it asks whether applicants can meet the "goal of the rule" in the licensor's subjective judgment. Rule 35; *see Burke*, 2024 WL 3548759, at *7 (finding evaluation based on "17 different subjective criteria, all of which must be demonstrated to the satisfaction of the Department" was not generally applicable (cleaned up)). This gives Vermont discretion to play favorites instead of providing guardrails to ensure an "evenhanded, across-the-board" application. *Kennedy*, 597 U.S. at 527.

Vermont's cited cases don't say anything different. The licensing scheme in *Illinois Bible Colleges Association v. Anderson* "d[id] not provide for individualized exemptions to the licensing requirement." 870 F.3d 631, 640 (7th Cir. 2017), *as amended* (Oct. 5, 2017). Zoning laws that provide exemptions are valid *if* they extend exemptions to religious entities. *Id.* (citing case in which city extended zoning exemptions to religious entities). And the vaccine-exemption scheme in *Rizzo v. New York City Department of Sanitation* was "different in kind from a standardless case-by-case system" like that in *Fulton*. No. 23-CV-7190, 2024 WL 3274455, at *6 (S.D.N.Y. July 2, 2024) (cleaned up).

Finally, Vermont denies (at 31) any evidence that it applied its Mandate "unevenly or in a manner that 'penalizes families with religiously informed views.'"

Reply in Support of Motion for Preliminary Injunction

But proving past uneven treatment is unnecessary; a mechanism for individualized assessments—even if never used—demands strict scrutiny because of the inherent discretion to disfavor religious exercise. *Fulton*, 593 U.S. at 537 (invalidating system "regardless whether any exceptions have been given").

At any rate, Vermont *is* treating Plaintiffs' religious exercise worse than "analogous nonreligious conduct." *Williams v. Annucci*, 895 F.3d 180, 189 (2d Cir. 2018). That's because parents need only respect religious and cultural beliefs, but they must verbally affirm beliefs about sexual and gender identities. For example, Vermont says it does not require families "to support and encourage a child's religious faith or identity" in a way that forces them "to compromise their own beliefs[.]" Opp'n 23 n.17. That's sensible. Imagine if Vermont forced a Jewish family to erect a Hindu shrine for their foster child.[3] Or required an atheist family to verbally assure a Christian child that God is real. *In re Adoption of E*, 279 A.2d 785 (N.J. 1971). These hypotheticals grate against our First Amendment instincts. *See* Opp'n 23 n.17. But forcing the Wuotis and the Gantts to verbally affirm ideas they don't agree with is no different. Only in the SOGIE context must families say and do things that "compromise their own beliefs." *Id.*

This shows that Vermont's policy is underinclusive. After all, Vermont says it requires parents to respect and support beliefs about sexuality and gender the same way they respect religious and cultural beliefs. Opp'n 22 (citing Rule 338). Every home must be "holistically affirming and supporting" of a child's identity, "even if the foster parents hold divergent personal opinions or beliefs." Sept. 8 Email at 2. Vermont also cites documents from the federal government confirming that support

---

[3] Diana van Bergen et al., *Moral Dilemmas in Foster Care Due to Religious Differences Between Birth Parents, Foster Parents, and Foster Children*, 40 Child and Adolescent Social Work J. 811, 816 (2022), https://link.springer.com/content/pdf/10.1007/s10560-021-00815-3.pdf (reciting similar, real-world conflict between foster parents and foster child) (attached as Ex. R, Doc 37-9).

Reply in Support of Motion for Preliminary Injunction

for a child's "religiosity" is "associated with improved outcomes in children[.]"[4] Yet in practice, Vermont treats religion and SOGIE differently, "rais[ing]s serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 801–02 (2011).

2. Moving to neutrality, Vermont denies (at 27) that its Mandate has any discriminatory purpose. But Defendants miss that treating "*any* comparable secular activity more favorably than religious exercise" shows a lack of general applicability *and* neutrality. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam); *accord FCA*, 82 F.4th at 686 ("[T]argeting is not required …. favoring comparable secular activity is sufficient."). And contrary to what Vermont argues (at 28), Plaintiffs don't cite *Blais* to make a disparate-impact argument.[5] *Blais* and *New Hope* recognized that a disconnect between a law or policy's plain terms and the actual application can reveal an overinclusive and non-neutral policy. As already explained, that analysis applies here to show that Vermont's policy is overinclusive. MPI 16.

Vermont argues (at 28) that its policies came from "a careful, data-driven policymaking process." That's wrong for at least three reasons. *First*, the data provides little support for the Mandate. For example, Vermont cites documents from the State's workgroup. Opp'n 5–6. But those documents don't purport to say anything about parents who are loving and supportive despite a difference of opinion. Vermont asserts (at 6) that the workgroup concluded that caregivers must use "preferred" pronouns to support a child's gender expression. *Id.* But that wasn't

---

[4] U.S. Gov't Accountability Off., GAO-22-104688, Foster Care: Further Assistance from HHS Would be Helpful in Supporting Youth's LGBTQ+ Identities and Religious Beliefs 49 (2022) (cited at Opp'n 11 n.9).

[5] The Mandate's disparate impact on religious persons seems plausible as it relates to verbally affirming ideas about same-sex romantic behavior.

Reply in Support of Motion for Preliminary Injunction

the workgroup's analysis; that part was copied-and-pasted from materials prepared by a political advocacy organization. Decl. Lindsay R. Barron, Ex. 3 at 2, Doc. 27-4.

*Second*, the policy produced by Vermont's research (Policy 76) doesn't match its current coercive tactics. For example, Policy 76 says Department officials should "encourage[ ]," not force, parents to support a child's gender expression. MPI, Ex. A at 10, Doc. 17-6. Policy 76 also envisions including while accommodating families who are (i) loving and supportive, (ii) "*not rejecting,*" and (iii) simultaneously "not *as supportive* as the young person needs." *Id.* (emphasis added). Plus, Policy 76 envisions individualized placements with "LGBTQ affirming" families, not categorical exclusions of families with different views. Then, the final Rules centered on anti-discrimination requirements (Rule 200) and requiring "[r]espect for the worth of all individuals regardless of … gender identity, [or] sexual identity" (Rule 201.10)—Rules that Plaintiffs will gladly follow. While Rule 315 does require support for a child's dress or hairstyle, the Rules don't say anything about pronouns, pride parades, or refraining from attending church.

*Third*, Vermont misses the temporal disconnect between Policy 76 and its Mandate. The Department convened a workgroup in 2016, crafted Policy 76 in 2017, but didn't propose its new Rules until December 2022, over five years later. Opp'n 5–8. During that time, both the Wuotis and the Gantts had renewed their licenses without "any concern" from the Department. Wuoti Decl. ¶ 53; Gantt Decl. ¶ 64. Vermont never explains what changed during the intervening years. This mismatch shows that Vermont proscribes more religious conduct than necessary.

### D.   The Mandate flunks any level of heightened scrutiny.

Because Vermont's Mandate infringes First Amendment rights, "the burden shifts to the State" to justify its regulation under strict scrutiny. *We The Patriots*, 17 F.4th at 281. But Vermont's Mandate doesn't promote the State's true interests,

Reply in Support of Motion for Preliminary Injunction

doesn't account for less-restrictive alternatives, and does not even help to protect children who identify as LGBT. That flunks *any* level of heightened scrutiny.

### i. The Mandate lacks a compelling or even legitimate interest in excluding Plaintiffs at the certification stage.

1. Vermont identifies its compelling interest as protecting foster children (at 33), but that describes things at too "high [a] level of generality." *Fulton*, 593 U.S. at 541. Instead, this Court must ask whether Vermont has a compelling interest in denying an exception to the Wuotis and the Gantts. *Id.*; *see also Annucci*, 895 F.3d at 190 (compelling interest requires government to show "not just its general interest, but its particularized interest in burdening the individual plaintiff in the precise way it has chosen").

Vermont also misses that its interests at the certification stage are broader than its interests at the placement stage. Barring reunification, the Department seeks "permanency options that are in the best interest of children and youth." MPI, Ex. B at 8, Doc. 17-7. To do that, Vermont should maximize the number of loving homes at the certification stage to maximize the opportunities for *each* child to achieve permanency or to find a safe, temporary home. MPI 17–18.

Plus, Vermont needs diverse families for diverse children to give them "opportunities for growth into free and independent well-developed [adults] and citizens." Opp'n 33. Vermont rejects that it takes away opportunities for children "to find like-minded, faithful homes." Opp'n 35 (cleaned up). Except it does, because a religious child who believes sex is immutable cannot go to a religious home with similar beliefs. Those families are categorically excluded. Vermont again seems to imply that Plaintiffs should simply "simulate assent by words without belief" to facilitate a "[c]ompulsory unification of opinion" that the Supreme Court has long condemned. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633, 641 (1943).

Given the State's "placement crisis," Vermont does not have even a legitimate interest in excluding a large segment of the population who could care for many children and would be the *best placement* for some of them. MPI, Ex. L at 2 (admitting insufficient "homes and supports to fill the need"); Compl., Ex. A at 2, Doc. 1-1 (advertising "[d]esperate need for [e]mergency [f]oster [h]omes"). Vermont even places children in "staffed" settings—a "24 hours a day, 7 days a week segregation" where youth "typically have no access to education, treatment, peer interactions, or community engagement."[6] A department watchdog reported visiting a youth in that setting who had "no educational or therapeutic programming, no contact with peers, and seemed to spend most of the day watching television."[7] Vermont musters no evidence that this alternative is better than placement with loving parents like the Wuotis and Gantts.

Vermont doubts (at 34) that half of the adult population fails their ideological litmus test but cites no evidence to justify its speculation. Yet here, Vermont bears the burden, not Plaintiffs. *We The Patriots*, 17 F.4th at 281. Nonetheless, one scholar ran the numbers and concluded that even using conservative estimates, excluding families like the Wuotis and the Gantts "would be devastating to the foster care system." David M. Smolin, *Kids Are Not Cakes: A Children's Rights Perspective on Fulton v. City of Philadelphia*, 52 Cumb. L. Rev. 79, 149 (2022). Vermont "apparently prefers to risk leaving children without foster parents than to allow" families like the Wuotis and the Gantts to abide by their conscience, "which threatens no tangible harm." *Fulton*, 593 U.S. at 550 (Alito, J., concurring).

---

[6] Vermont's Office of the Child, Youth and Family Advocate, 2023 Annual Report to the Governor and General Assembly 23 (Dec. 26, 2023), https://legislature.vermont.gov/assets/Legislative-Reports/2023-OCYFA-Report-FINAL.pdf.
[7] *Id.*

Reply in Support of Motion for Preliminary Injunction

2. Once Vermont's true interests are laid bare, the State's defense collapses. Vermont argues (at 34) that the Wuotis and the Gantts cannot adequately care for children who identify as LGBT or might identify as LGBT in the future. The Wuoti and the Gantts fervently dispute that and are willing to care for any child. *Infra* § I.D.iii. Regardless, at the certification stage, Vermont's interest is not limited to *only* LGBT children; Vermont must serve the best interest of *every* child, and "not every foster home is the best placement for every child." Defs.' Answer to Pls.' V. Compl. ¶ 95, Doc. 29 ("Answer"). The "Department tries to consider the individual circumstances of both children and foster families in making placement decisions," and "generally views it as a positive that foster families have different strengths and interests." Answer ¶¶ 99, 104. And not every child identifies as LGBT, will identify as LGBT, or agrees with the Department's ideological views on LGBT issues. Opp'n 34; *see Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring) ("[T]he transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)."). Because Plaintiffs are loving, capable parents, even Vermont should agree that they can at least care for *some* children in *some* circumstances. MPI 19–20. Yet Vermont excluded them upfront from caring for any child. That categorical exclusion cannot possibly "bear any meaningful relationship" to Vermont's interest to help every child. *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 193 (1999) (applying heightened scrutiny).

To make matters worse, Vermont's policies are selective and underinclusive, requiring families to affirm ideological views only on SOGIE issues. *Supra* 6. Vermont argues (at 35) that it only requires applicants to treat LGBT children the same way they "treat children of a different race or religious background respectfully." But that's incorrect. If Vermont merely required respect, it could have

Reply in Support of Motion for Preliminary Injunction

easily licensed the Wuotis and the Gantts. The Wuotis' licensor had "no doubt that [they] would be welcoming to a child." MPI 11 (quoting Wuoti Emails at 9). And no official ever suggested that either family failed to respect "the worth of all individuals regardless of … gender identity, [or] sexual identity." Rule 201.10. Still, Vermont required Plaintiffs to agree to affirm ideas and beliefs that contradict their own faith. And *only* in this context are parents who want to abide by their conscience labeled "unaccepting," providing more evidence that the policy is underinclusive. *Supra* 13–14.

Finally, while the State can protect children from real harms (*supra* 5), it "cannot [impose] selective limitations upon speech." *R.A.V.*, 505 U.S. at 392. Yet in Vermont, parents have to verbally support a child's sexual orientation and gender identity, but not their religious, cultural, or "political affiliation." *Id.* at 391. The State's interest in protecting groups it deems vulnerable does not justify singling out particular views—even those it considers "biases"—for worse treatment. *Id.* at 396.

### ii. The Mandate lacks narrow tailoring, and Vermont has many less-restrictive alternatives.

Vermont argues it can't tailor its policies because "it is not possible for DCF to know or reasonably predict which child is or will prove to be LGBTQ." Opp'n 36. This fails for at least seven reasons.

*First*, a regulation "is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). But a categorical ban on certain viewpoints is the opposite of that. Plaintiffs already provided examples of children that could be placed with families like the Wuotis and the Gantts even under Vermont's views. MPI 21. Vermont has no response. That is because licensing the Wuotis to provide short-term respite care for infants does not present any risk that the child's hypothetical future LGBT

Reply in Support of Motion for Preliminary Injunction

identity won't be affirmed. Similarly, Vermont does not even allow the Wuotis and the Gantts to foster a 17-year-old who fervently shares all their religious beliefs. Nor does Vermont explain how the Gantts went from being "the perfect home" for an infant suffering from maternal drug use to persona non grata in an instant. Compl. ¶ 226. Vermont's concerns about protecting children ring hollow when it excludes loving families despite the State's "desperation" for more homes. Compl., Ex. A at 2.

*Second*, Vermont does not disclose the likelihood that a child will identify as LGBT, nor does it present any evidence it can't calculate that number. *Contra* Opp'n 36. Vermont could at least have commissioned longitudinal studies to quantify these figures. Vermont never shows that such means of quantifying this are unattainable, and simply asserting it (at 36) doesn't cut it. *McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (rejecting government's blanket assertion that it "tried other approaches").

At most, Vermont argues (at 12–13, 34) that children who identify as LGBT are overrepresented in the foster-care system. But that evidence is both flawed and irrelevant. None of its studies purported to provide accurate or representative numbers about children in foster care—in Vermont or elsewhere. Indeed, surveys of adolescents and teenagers cannot be extrapolated to infants and toddlers. Plus, none of the surveys evaluated the chances that any individual child who doesn't identify as LGBT will so identify in the future. And even if 30% of foster children identify as LGBT (Opp'n 12), that means Vermont's fears have no application to 70% of kids. For the majority of placements, applying Vermont's Mandate has no "connection between the prohibited speech … and the asserted interest[.]" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 115–16 (2d Cir. 2017) (applying heightened scrutiny).

Reply in Support of Motion for Preliminary Injunction

Vermont again (at 34) appeals to *Bates,* but that court misapplied heightened scrutiny, put the burden on the applicant to disprove the state's unproven fears of future harm, and did not consider any evidence about that harm. 2023 WL 7546002 at *25–26 (agreeing evidence of risks was "not readily available" and court would not force government to "bear the risk of uncertainty"). Plus, *Bates* involved a woman wanting to adopt children under nine. *Id*. Here, Plaintiffs want the opportunity to serve kids of any age from any background, whether in respite care for toddlers, foster care for newborns, or adopting a child from their community. *E.g.*, Second Wuoti Decl. ¶¶ 34–37.

*Third*, if Vermont cannot predict the odds a child will identify as LGBT, that concedes its fears are speculative. Vermont fears that (1) it might place a child for long-term foster care (as opposed to respite care) with Plaintiffs, (2) the child might later identify as LGBT, (3) the child might insist that parents use chosen pronouns or some other behavior that Plaintiffs cannot support, (4) Plaintiffs might not be able to find a workaround, and (5) the child might suffer as a result. With so many speculative links in that causation chain, Vermont's argument could not even show causation for standing, much less certain harm to satisfy strict scrutiny. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) ("speculative chain of possibilities" insufficient to show harm for standing). Vermont's fears are simply based on conjecture, failing any level of heightened scrutiny. *Cornelio v. Connecticut*, 32 F.4th 160, 171 (2d Cir. 2022) ("recited harms" must be "real, not merely conjectural," and regulation must "alleviate these harms in a direct and material way" (cleaned up)).

*Fourth*, Vermont appeals (at 36) to its need for certainty that children do not experience rejection. But under strict scrutiny, Vermont "bears the risk of uncertainty," not Plaintiffs. *Brown*, 564 U.S. at 799–800. And every child placement carries risks. Under Vermont's logic, it could force parents to affirm religious and cultural beliefs they disagree with. After all, an atheist child could become religious.

Or a healthy child could suffer a disability. Yet Vermont licenses other families without requiring them to show that they will affirm religious ideas they reject or that they can care for children with disabilities. *Supra* 13–14. So Vermont applies its logic about evolving identities inconsistently. *Contra* Opp'n 35 (arguing policy is not underinclusive because it can't predict whether a child will identify as LGBT).

What's more, the fact that an alternative "may be inconvenient, or may not go perfectly every time" is no excuse to burden First Amendment rights. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 824 (2000). In *Brown*, California could not ban selling violent video games to minors when the state had a narrower alternative: the video-game industry's voluntary rating system. 564 U.S. at 803 n.9. That system was flawed because it still allowed 20% of minors to purchase violent videogames. *Id.* But California did not "have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* That logic applies even more here because Vermont never quantifies the "gap" in enforcing its interests.

*Fifth*, Vermont argues (at 37) that licensing Plaintiffs "would exacerbate the problem," because children would be *more* fearful of disclosing their identities. But Vermont doesn't provide any proof of that. And courts cannot defer to the government's mere "say-so." *Annucci*, 895 F.3d at 189. In fact, the federal government reviewed the same studies that Vermont relies on and concluded agencies should empower children to choose "Designated Placements," even if they were not comfortable disclosing to officials how they identify.[8]

*Sixth*, Vermont frets (at 37) about having children "given back to DCF." But Plaintiffs will love and respect any child and would never ask the State to remove a child because of how they identify. Wuoti Decl. ¶ 119; Gantt Decl. ¶ 149. And

---

[8] Designated Placement Requirements Under Titles IV-E and IV-B for LGBTQI+ Children, 89 Fed. Reg. 34,818, 34,845, 34,859 (April 30, 2024) (to be codified at 45 C.F.R. § 1355).

removal is an even smaller risk than an irretractable conflict occurring in the first place. *Supra* 20–21 (explaining speculative nature of Vermont's concerns). Moreover, Vermont doesn't have enough families to meet its current needs. So the real question is whether the risk of an unsuccessful placement is greater than the harm of not placing a child at all. Vermont hasn't even tried to show that.

> *Seventh*, Vermont concludes (at 37) that its Mandate "is the State's only alternative." But Vermont hasn't offered any proof of this either. Plaintiffs pointed to other states that license families like the Wuotis and the Gantts without any issues. MPI 23 n.7. Plaintiffs cited new federal rules that "welcome[ ] … religious foster parents," without requiring them violate their faith.[9] MPI 22. Plaintiffs provided less-restrictive alternatives like licensing the families for respite care. *Id.* at 21. Plaintiffs proposed other methods of mitigating the perceived harms, without categorically disfavoring families because of their religious beliefs. *Id.* at 22. Vermont responds with crickets. It hasn't shown that "it seriously undertook to address the problem with less intrusive tools readily available to it," or that it even "considered different methods that other jurisdictions have found effective." *McCullen*, 573 U.S. at 494.

### iii.    The Mandate fails to protect LGBT children too.

Because the Wuotis and the Gantts can care for at least some children in some circumstances, Vermont can't justify its categorical exclusion. But even with respect to children who identify as LGBT (or who may so identify in the future), Vermont cannot justify its exclusion.

> To begin, Vermont contends (at 35) that the *Cass Review* only focused on medicalized transition, not the issue here. Actually, the report had an entire section on social transition and said the "quality of the studies" in this area "was not

---

[9] 89 Fed. Reg. at 34,848.

Reply in Support of Motion for Preliminary Injunction

good."[10] At the very least, Vermont's argument indicates that this case is about speech (pronouns and expressing support), and not about facilitating access to certain procedures (conduct). But Vermont cites no study or evidence that loving families who want to speak consistent with their beliefs about biological sex are unfit to care for—much less harmful to—children of diverse gender identities. Making such a claim would raise more than a "slight suspicion" of religious animus. *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018) (protecting similar views). Religious families care for their LGBT children all the time while respectfully and lovingly disagreeing with them. In fact, the Wuotis and Gantts are more qualified than most on this score. Rev. Gantt cares for and serves people who do not share his beliefs all the time. Gantt Decl. ¶¶ 138–41. Rev. Wuoti does the same as a pastor and as a teacher. Wuoti Decl. ¶ 106. And Katy Wuoti struggled with gender dysphoria as a child and can sympathize personally with others going through the same. Wuoti Decl. ¶¶ 90–91.

Ignoring these facts, Vermont cites studies to show a connection between family rejection and negative outcomes for LGBT children. Opp'n 13–14. But courts "applying strict scrutiny must ensure that a compelling interest supports *each application* of a statute restricting speech." *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 478 (2007). And Vermont's studies don't do so here for at least two reasons.

*First*, the studies don't say much about this case. For example, the Trevor Project survey suggests some "common ways" in which "LGBTQ youth reported feeling supported." Opp'n 13. While the Wuotis and the Gantts cannot use chosen pronouns, they would speak "respectfully" with a child about their LGBTQ identity

---

[10] Hilary Cass, *The Cass Review: Independent Review of Gender Identity Services for Children and Young People: Final Report,* 162 (April 2024), https://cass.independent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf (attached as Ex. M, Doc. 37-4.)

Reply in Support of Motion for Preliminary Injunction

and be "welcoming" to their LGBT friends. *Compare id.*, *with* Wuoti Decl. ¶¶ 105, 108; Gantt Decl. ¶¶ 130, 135, 137–44. This survey doesn't purport to address families like the Wuotis and the Gantts.[11]

Vermont's other studies suffer the same flaw. *See* Opp'n 14. They do not purport to examine how children fared in religious homes that were loving and caring despite disagreeing about sexual ethics or the human body. For example, research by the Family Acceptance Project (which Vermont's other studies also cite) purports to show a link between family acceptance and positive health outcomes for LGBT persons. Opp'n 13–15. But this non-representative study does not even fully describe what "positive family experiences" it measured. *See Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 578 (7th Cir. 2001) ("psychological studies" on video games did not support restriction on sales to minors because there was "no indication that the games used in the studies [we]re similar to those in the record"). Vermont seeks to paint family portraits using broad and reductive categories of "rejecting" or "accepting," when in reality parents can disagree with a child without disparaging or rejecting them.

In fact, Vermont's studies show that Plaintiffs already engage in many supportive behaviors.[12] The Wuotis would love a child unconditionally, "always include any foster child in all [their] family events," and "immediately affirm [their] unconditional love for" a child who disclosed their LGBT identity. Wuoti Decl. ¶¶

---

[11] *See also* Stephen B. Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, 48 J. of Sex & Marital Therapy 706, 713 (Mar. 17, 2022), https://doi.org/10.1080/0092623X.2022.2046221 (criticizing Trevor Project national survey) (attached as Ex. O, Doc. 37-6).

[12] Caitlin Ryan et al., *Family Acceptance in Adolescence and the Health of LGBTQ Young Adults*, 23 J. of Child & Adolescent Psychiatric Nursing 205, 211 (Nov. 2010) (cited at Opp'n 14 n.14) (listing examples of supportive behavior); *see also* Caitlin Ryan & Robert Rees, S.F. State Univ., Family Acceptance Project, *Supportive Families, Healthy Children* 9 (2012), https://familyproject.sfsu.edu/sites/default/files/documents/FAP%20LDS%20Booklet%20pst.pdf (cited at Opp'n 13 n.12).

Reply in Support of Motion for Preliminary Injunction

108–13. Similarly, the Gantts "would advocate and stand up for any of [their] children if they were being bullied or faced any type of discrimination," ensure their child felt "loved and cared for," and "try to understand where the child was coming from and empathize with them." Gantt Decl. ¶¶ 143–51.

Further, the Wuotis and Gantts would never do the activities the study's authors discourage.[13] The Wuotis would never treat a child disrespectfully, "punish a child," or "denigrate, abuse, reject, or harass a child" because they identified as LGBT. Wuoti Decl. ¶¶ 108–12. Neither would the Gantts "exclude a child from family activities," "punish them," or "tease, abuse, shame, embarrass, reject, or denigrate a child because of how they identify." Gantt Decl. ¶¶ 147–50. If survey participants who scored "low" on the family-acceptance score experienced these types of behaviors, that survey cannot apply here. Vermont conjectures that Plaintiffs' speech and beliefs could harm LGBT children but doesn't present any evidence tailored to their actual behavior and convictions. And "mere conjecture" is "[in]adequate to carry a First Amendment burden." *FEC v. Cruz*, 596 U.S. 289, 307 (2022) (cleaned up) (applying heightened scrutiny).

Thankfully, this Court need not deconstruct these studies because the director of the Family Acceptance Project—the lynchpin of Vermont's arguments— has made it clear: religious families "don't have to choose between their LGBT child and their faith." Opp'n 35 n.22 (quoting Ryan, *Parents Don't Have To Choose, supra* 2 n.1)). Weirdly, Vermont cites Caitlin Ryan's articles to suggest that Plaintiffs are the problem, but her project's entire purpose is to "help all families—especially socially and religiously conservative ones—to support their LGBT children."[14] According to Ryan, "[p]arents and families can support their LGBT child … by

---

[13] Ryan, *Supportive Families, Healthy Children, supra* n.12, at 8 (listing example of rejecting behaviors).
[14] Ryan, *Parents Don't Have To Choose, supra* n.1.

Reply in Support of Motion for Preliminary Injunction

simple actions that don't require them to accept a 'behavior' or 'identity' they don't condone."[15] In fact, Ryan highlights many behaviors Plaintiffs are happy to do, like "talking with their child respectfully to begin to understand their child's experiences; requiring that other family members respect their child even if they disagree; and advocating for their child when others mistreat them."[16]

In other words, everyone (apparently even Vermont) agrees that parents like Plaintiffs can support LGBT children *without* violating their faith. Yet Vermont continues to insist that the Wuotis and the Gantts agree to speak against their convictions, just in case they might say something that might someday offend a child who might someday identify as LGBT. All this confirms that Vermont is primarily engaged in an ideological battle, no matter the collateral damage to children who lack a place to call home.

*Second*, whatever Vermont's studies purport to say, they cannot show causation between the alleged "rejecting" behaviors and negative health outcomes. *Brown* is instructive. There, California defended its law against selling violent video games to minors by citing studies showing that such games are "significantly linked to increases in aggressive behaviour[.]" *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 963 (9th Cir. 2009), *aff'd sub nom. Brown*, 564 U.S. 786. But that link did not satisfy strict scrutiny because the studies did "not prove that violent video games *cause* minors to *act* aggressively." *Brown*, 564 U.S. at 800.

Vermont's evidence suffers from similar methodological flaws. Vermont argues that certain supportive behaviors are "closely correlated" or "associated with a litany of improved outcomes." Opp'n 13–14. For example, Vermont cites one study titled "Chosen Name Use is *Linked* to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth." Opp'n 14 n.15

---

[15] *Id.*
[16] *Id.*

Reply in Support of Motion for Preliminary Injunction

(emphasis added). So at most, Vermont's studies showed "correlation, not evidence of causation[.]" *Brown*, 564 U.S. at 799–800.  And that is insufficient to carry its burden under strict scrutiny. *Id.*

Indeed, a systematic review of studies on social transitioning (including both Steven T. Russell studies that Vermont cites (Opp'n 14)) concluded that these studies were of such "low quality" that it was impossible to assess whether social transitioning resulted in any positive health outcomes.[17] A different study came to the same conclusion, noting that "there were no significant effects of social transition or name change on mental health status."[18] The *Cass Review* agrees.[19]

If weak correlation like this could carry Vermont's burden, states could exclude all sorts of families for all sorts of reasons. For example, a 2022 Columbia University study concluded that adolescents with liberal political views were more likely to suffer loneliness and depression.[20] A 2018 study found religiosity in adolescence was associated with positive psychological effects and less depression.[21] Could Vermont justifiably exclude foster applicants who want to convey politically liberal or non-religious views? Vermont's argument would justify these and other dark outcomes. *See Palmore v. Sidoti*, 466 U.S. 429, 431–32 (1984) (documenting

---

[17] Ruth Hall et al., *Impact of Social Transition in Relation to Gender for Children and Adolescents: A Systematic Review*, Archives of Diseases in Childhood (Apr. 9, 2024), doi.org/10.1136/archdischild-2023-326112 (attached as Ex. N, Doc. 37-5).
[18] James S. Morandini et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, 52 Archives of Sexual Behav. 1045–1060 (2023), https://link.springer.com/content/pdf/10.1007/s10508-023-02588-5.pdf (attached as Ex. P, Doc. 37-7).
[19] Cass, *supra* n.10, at 158–63.
[20] Catherine Gimbrone et al., *The Politics of Depression: Diverging Trends in Internalizing Symptoms Among US Adolescents by Political Beliefs*, 2 SSM Mental Health 100043 (2022), doi.org/10.1016/j.ssmmh.2021.100043.
[21] Ying Chen & Tyler J. VanderWeele, *Associations of Religious Upbringing With Subsequent Health and Well-Being From Adolescence to Young Adulthood: An Outcome-Wide Analysis*, 187 Am. J. of Epidemiology 11:2355 (2018), https://doi.org/10.1093/aje/kwy142.

Reply in Support of Motion for Preliminary Injunction

lower court order refusing custody to interracial couple for fear of the "damaging impact on the child from remaining in a racially mixed household."). This Court should refuse Vermont's invitation to walk this path.

## II.   The Mandate is vague.

Vermont fails to meaningfully rebut Plaintiffs' vagueness arguments. Vermont argues (at 38) that vague provisions like Rule 201.2 and 301 "are illuminated by very specific non-discrimination provisions" in "Rules 200, 201.10, & 315." Again, this mistakes reasonable disagreement for discrimination. Tellingly, the Department never alleges that Plaintiffs violated the anti-discrimination Rules, or that the Wuotis violated Rule 315.

Vermont argues (at 38) that the words "affirming or accepting" aren't vague. But the Rules at issue here don't use those words. Instead, the Rules speak about sufficient knowledge of child development and meeting a child's emotional needs. *See Burke*, 2024 WL 3548759 at *7 (finding similar policies were "subjective"). Rule 315 uses the word "support" only about hair and clothing choices. And Policy 76 uses these words, but facially doesn't contain any requirements for foster parents. MPI 16. Once again, Vermont seeks to have it both ways; hiding behind the vagueness of its provisions to downplay any conscience conflicts (*supra* 5–6), while insisting that its requirements are clear to avoid vagueness problems. Vermont's own double-speak and their refusal to certify Plaintiffs give the game away

Vermont's cited cases are inapposite too. That similar terms survive a *facial* vagueness challenge says little about the as-applied challenge here. *See Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 126 (2d Cir. 2020)). Neither is a general licensing provision regulating conduct (where there's more tolerance for vagueness) comparable to a licensing provision that compels ideological speech. *See Clavin v. Cnty. of Orange*, 38 F. Supp. 3d 391, 398 (S.D.N.Y. 2014); *Rubin v. Garvin*, 544 F.3d

Reply in Support of Motion for Preliminary Injunction

461, 468 (2d Cir. 2008) ("[L]aws that might infringe constitutional rights [are] the strictest of all."). If anything, Plaintiffs' analogy (at 38) to "good cause" provisions and licensing schemes that use "inherently individualized and fact-specific" inquiries confirms that Vermont uses individualized assessments.

Vermont counters (at 39) that its licensing process is "open," and "explanatory." But that's not what the Wuotis experienced. The Department asked them to self-rate from one to five how "supportive of an LGBTQ foster child" they perceived themselves to be. Wuoti Decl. ¶ 71. They wrote "3" because they thought the question was ambiguous. *Id.* ¶¶ 74–77. Murphy prompted them to provide more information. *See* Wuoti Emails at 10–11. And based solely on two emails, Murphy advised them to withdraw their application, admitting that they would "offer warmth and compassion" and "be welcoming to a child," but denying they could "encourage and support children in their sexual and gender identity[.]" *Id.* at 9.

## III.    The remaining factors favor an injunction.

Vermont argues (40) that an injunction would force the Department "to place children with foster parents" who could inflict "permanent and substantial" harms. This fearmongering is baseless. The Wuotis and the Gantts merely ask for the *opportunity* to act as foster parents, without being penalized for exercising their First Amendment rights. Contrary to what Vermont argues, its Mandate harms children in foster care most of all, the very reason Plaintiffs seek an injunction.

### CONCLUSION

This Court should grant Plaintiffs' requested injunction.

Respectfully submitted,

Gretchen M. Wade
New Hampshire Bar No. 273726
**Wadleigh, Starr & Peters, P.L.L.C.**
95 Market Street
Manchester, NH 03101
(603) 669-4140
(603) 669-6018 Fax
gwade@wadleighlaw.com

*/s/ Johannes Widmalm-Delphonse*
Johannes Widmalm-Delphonse*
Virginia Bar No. 96040
Mallory B. Rechtenbach*
Nebraska Bar No. 27129
**Alliance Defending Freedom**
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
(571) 707-4656 Fax
jwidmalmdelphonse@ADFlegal.org
mrechtenbach@ADFlegal.org

Jonathan A. Scruggs*
Arizona Bar No. 030505
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org

Suzanne E. Beecher*
California Bar No. 329586
**Alliance Defending Freedom**
440 First Street NW
Washington, D.C. 20001
(202) 393-8690
(202) 347-3622 Fax
sbeecher@ADFlegal.org

*Admitted pro hac vice*
*Attorneys for Plaintiffs*

Reply in Support of Motion for Preliminary Injunction

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

Dated: August 26, 2024

*s/Johannes Widmalm-Delphonse*

Johannes Widmalm-Delphonse
*Attorney for Plaintiffs*