UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

BRIAN WUOTI; KAITLYN WUOTI;      )
MICHAEL GANTT; and REBECCA       )
GANTT,                           )
                                 )
       Plaintiffs,               )
                                 )
           v.                    )    Case No. 2:24-cv-614
                                 )
CHRISTOPHER WINTERS, in his      )
official capacity as             )
Commissioner of the Vermont      )
Department for Children and      )
Families, ARYKA RADKE in her     )
official capacity as Deputy      )
Commissioner of the Family       )
Services Division, and           )
STACEY EDMUNDS, in her           )
official capacity as Director    )
of Residential Licensing and     )
Special Investigations,          )
                                 )
       Defendants.               )

## OPINION AND ORDER

Plaintiffs Brian Wuoti, Kaitlyn Wuoti, Michael Gantt, and

Rebecca Gantt ("Plaintiffs") bring this action claiming

violations of their constitutional rights when Defendants,

acting on behalf of the Vermont Department for Children and

Families ("DCF"), declined to renew their licenses to serve as

foster parents.  The case centers on Plaintiffs' objections to

DCF policies relating to the care of LGBTQ foster children.

Plaintiffs submit that those policies are inconsistent with

their Christian beliefs, and that denying them foster care

licenses based on their objections was unlawful.  Before the
Court is Plaintiffs' motion for a preliminary injunction.  For
the reasons set forth below, the motion is denied.

**<u>Factual Background</u>**

## I.    Responsibility for Foster Children's Care

The Vermont Department for Children and Families ("DCF")
administers the State's foster care program according to its
Licensing Rules for Foster Homes in Vermont ("Rules").  When a
child is in foster care, DCF retains control over the child's
"care, maintenance, and education."  33 V.S.A. § 104(9).  While
DCF maintains legal custody of the child, foster caregivers are
required to make "careful and sensible parental decisions that
maintain the health, safety, and best interests of a child or
youth" while "at the same time encouraging the emotional and
developmental growth of the child."  *Id.* § 4906.  Accordingly,
foster parents must demonstrate to DCF that they are able to
"meet the physical, emotional, developmental and educational
needs of each foster child."  Rule 301.

## II.   LGBTQ Protections in the Foster Care Program

DCF Rules and Policies provide certain protections for
LGBTQ children within the foster care system.  For background on
the development of those protections, Defendants have submitted
the Declaration of Lindsay Barron, Policy and Planning Manager
in DCF's Family Services Division ("FSD").  ECF No. 27.  Prior

2

to becoming Policy and Planning Manager, Barron served as an FSD
Planning and Policy Advisor.  In that prior role, she
participated in the policy-development process at FSD.

Barron explains that in mid-2015, DCF realized that the
foster care system's treatment of LGBTQ youth required a
significant review.  Certain community partners were reporting
youth concerns about the lack of attention to their needs, and
DCF was receiving an increasing number of questions about how to
deal with issues such as exploration of sexual orientation and
gender identity.  DCF did not have a policy in place at that
time regarding the treatment of LGBTQ foster children.

Barron further explains that research had begun to show
that LGBTQ children were overrepresented in foster care systems
and were experiencing poor outcomes nationally.  Data compiled
by the Vermont Department of Health showed a substantially
increased risk of negative outcomes among LGBTQ youth, including
depression, suicidality, sexual assault, missing school, and
substance abuse.  Vermont's findings were consistent with other
studies, which showed the serious challenges facing LGBTQ youth.

In response to these concerns, DCF convened a multi-
disciplinary LGBTQ Workgroup in early 2016.  In September 2016,
the group released a report summarizing feedback from focus
groups involving children in DCF custody.  In early 2017, DCF
created a new policy, Policy 76, intended to improve outcomes by

providing "safe, healthy, and inclusive environment[s] for all children and youth served by the division."  ECF No. 27-5 at 1. Policy 76 acknowledges that exploring sexual orientation, gender identity, and gender expression "is a normal part of human identity development," and that DCF will prohibit "discrimination and bias based on a child or youth's real or perceived sexual orientation, gender identity or gender expression."  *Id.*  Policy 76 requires staff to consider a potential caregiver's "attitude and behavior" about children's sexual or gender identity, and to make "ongoing efforts to recruit, train, support, and retain foster families who are LGBTQ affirming and supporting."  *Id.* at 5.

Later in 2017, DCF amended Policy 76 to add guidance regarding "additional supports and resources" for families "to work through barriers they may face regarding their child's gender or sexual identity."  ECF No. 27-6 at 1.  In 2018, DCF received a "Youth Advocacy Document" from Forward Youth Advisory Board, a group of young people ages 14 to 22 who each had experience in Vermont's foster care system.  ECF No. 27-8.  The Youth Advocacy Document expressed the need for foster homes where children are safe, comfortable, and treated with dignity, and specifically recommended that DCF require all foster parents to take the LGBTQ training offered by the department.

4

In November 2022, DCF updated and clarified its Foster Care Licensing Rules with respect to LGBTQ youth. DCF added language to Rule 200, the department's anti-discrimination rule, expressly prohibiting a foster parent from discriminating against a foster child based on sexual orientation or gender identity. Rule 201.10 requires "[r]espect for the worth of all individuals regardless of race, color, national origin, ancestry, culture, religion, sex, gender identity, sexual identity, and physical or mental ability." Rule 315 requires foster parents to support children in wearing hairstyles, clothing, and accessories affirming the child's racial, cultural, tribal, religious, or gender identity. DCF further amended Rule 035, adding a provision that prohibits the department from granting variances from Rules 200, 201, and 315.

## III. The Licensing Process

When considering prospective foster parents for licensing, members of DCF's Residential Licensing Special Investigation ("RLSI") unit conduct a background check, interviews, and home site visits. Pursuant to Policy 76, RLSI workers are tasked with "[k]eeping children and youth safe while meeting their unique needs, regardless of whether these needs are related to their sexual orientation, gender identity, or gender expression." ECF No. 17-6 at 2. The foster care license application also asks self-assessment questions, in which

5

applicants are asked to rate on a scale of 1 to 5 their
agreement with various statements, including: "My family would
be accepting and supportive of an LGBTQ foster child." ECF No.
28-1 at 9.

RLSI Director Stacey Edmunds explains in her Declaration
that applicants who rate themselves at the low end of the self-
assessment scale often do so because they do not know what it
means to be supportive, or because they do not know much about
LGBTQ youth. RLSI works to help those applicants better
understand the requirements and what it would mean to be
supportive. Many such applicants are ultimately licensed.

Edmunds asserts that the reasons for an applicant's
possible discomfort with LGBTQ children are not considered by
RLSI. The focus is instead on the well-being of the child.
According to Edmunds, multiple Vermont families have expressed
concerns based upon their religious beliefs, and after learning
more about what is required to care for LGBTQ children or youth,
have "reached the point where they could commit to being
supportive and affirming of an individual child in their care,
notwithstanding broader beliefs about sexual orientation and
gender identity." ECF No. 28 at 4, ¶ 14.

Because foster parents may not discriminate, they must be
willing to accept any child. Rule 200.1 does provide an
exception for parents who are unable to foster children of a

particular age or with special needs.  Rule 200.1 does not allow applicants to refuse care for children based on any of the statuses listed in Rule 200, which include sexual orientation or gender identity.

Defendants' memorandum cites research on the importance of family acceptance for LGBTQ youth.  Such studies reportedly show that "highly rejected" LGBTQ youth are far more likely to suffer from high levels of depression, attempt suicide, use drugs, and be at risk for sexually transmitted diseases.  Support by caregivers includes being welcoming to LGBTQ friends or partners, talking respectfully about the individual's LGBTQ identity, using names and pronouns correctly, supporting gender expression, and educating themselves about LGBTQ people and issues.  Family support is associated with improved outcomes including greater self-esteem, better health, less depression, less substance abuse, and fewer suicide attempts.

## IV.  Plaintiffs' Licenses

### A.  The Wuotis

Brian and Kaitlyn (Katy) Wuoti are Christians.  Brian is the pastor of a nondenominational church.  Katy homeschools their five children and helps lead two Bible studies.  They attest that their faith inspired them to care for vulnerable children in foster care.  They became foster parents in 2014,

have two adopted children from foster care, and have three
biological children.

In May 2021, the Wuotis applied to renew their foster care
license.  Christopher Murphy, an official with DCF, conducted a
home visit as part of the renewal process.  After the visit, he
sent the Wuotis a form asking them to rate on a scale of one to
five whether they agreed that their family would be accepting
and supportive of an LGBTQ foster child.  Brian and Katy each
responded with a "three."

Murphy subsequently emailed the Wuotis and asked them what
might be needed to increase their responses to a four or a five.
The Wuotis stated while they would love and accept any child,
they could not encourage a child to pursue same-sex romantic
behavior or transition to the opposite gender.  Katy explained
that "we realize not everyone would interpret our Biblical views
as accepting and supporting.  Just like we would never encourage
a child to pursue pornography, sex outside of marriage, or
feelings of pedophilia, we would not encourage a child to pursue
their feelings of homosexuality."  ECF No. 17-10 at 10.

Murphy thanked Katy for "such a thoughtful and honest
answer to my question."  *Id.* at 9.  He also explained that DCF
had begun asking potential foster parents about LGBTQ issues due
to "overwhelming evidence of how important acceptance and
support is to outcomes for LGBTQ youth.  Very often, the wors[t]

8

sorts of outcomes you can imagine (suicide, substance abuse,
human trafficking) are shown to be tied to living in homes that
were not affirming of their sexual and gender identities." *Id.*
Murphy explained that because the Wuotis would be unable to
"encourage and support children in their sexual and gender
identity," they were not eligible for a renewed license. *Id.*

On April 22, 2022, DCF issued a Notice of Decision
("Notice") revoking the Wuotis' license. The Notice concluded
that the Wuotis had not demonstrated compliance with Section
201.2, which requires "[k]nowledge of child development and the
needs of children." ECF No. 17-8 at 2. The basis for that
finding, according to the Notice, was that "Mrs. Wuoti indicated
that the two of you found homosexuality to be on par with
pornography and pedophilia, as items you would 'never encourage
a child to pursue.'" *Id.* The Notice also stated that the
Wuotis had not shown they were able to satisfy Rule 301, which
requires foster families to "meet the physical, emotional,
developmental, and educational needs of each foster child, in
accordance with the child's case plan." *Id.* In support of that
finding, the Notice again cited Katy's email in which she
explained that she and her husband "would not encourage a child
to pursue their feelings of homosexuality," and would actively
"encourage (not force)" a child to deny their LGBTQ+ identity.
*Id.*

9

The Wuotis filed an administrative appeal to the Vermont Human Services Board ("Board"). After an in-person hearing, the Board denied the appeal. The Board found, in part, that the Wuotis' "stated intent to encourage a child to deny same-sex attraction or a particular gender identity and to 'not encourage a child to pursue their feelings of homosexuality'" showed "a lack of understanding of child development and, at the least, an inability to meet the emotional and developmental needs of an LGBTQ child." ECF No. 28-2 at 17. In response to the Wuotis' argument that DCF could place a non-LGBTQ child in their care, the Board noted the investigator's explanation that "sexual orientation might not be apparent or visible" at the time of placement. *Id.* at 17-18. The Board also cited the investigator's explanation that "screening a child for sexual orientation or gender identity would be problematic because it would cross boundaries respecting the child's privacy." *Id.* at 18.

The Board ultimately found that "it is undisputed [the Wuotis] are warm, loving, kind, and respectful people who have a history of parenting foster children without raising any concerns." *Id.* at 21. The Board further concluded that the Wuotis, through their own statements, established "that they are unable to provide encouragement to a child who might have feelings of same-sex attraction, particularly if the child

wishes to explore or pursue such feelings." *Id.* The Board
found that DCF had "based its decision not on [the Wuotis']
beliefs, but [on] how they stated they would act towards LGBTQ
children," and that DCF's denial of the application was not an
abuse of discretion. *Id.* at 22-23.

    **B.  The Gantts**

    Like the Wuotis, Michael and Rebecca Gantt are Christians.
Brian serves as the pastor of a local church. Rebecca dedicates
her time to raising their seven children. Of those seven
children, three are adopted and four are biological.

    In September 2023, DCF asked the Gantts if they would
provide foster care for a baby boy about to be born to a woman
suffering from drug addiction. DCF reportedly informed the
Gantts that they would be "the most qualified" and the
"unanimous choice" for this child. Later in 2023, Michael Gantt
exchanged emails with DCF Resource Coordinator Michelle Colburn
regarding the impact of DCF's new licensing rules. ECF No. 17-9
at 3. In that exchange, Michael explained that the Gantts would
love any child regardless of how the child identified but could
not use pronouns consistent with that identification. Ms.
Colburn reportedly informed RLSI investigator Murphy, who spoke
with Michael by phone on January 22, 2024.

    During that conversation, Michael again stated that while
he and his wife would be loving and supporting of any child in

their care, being "affirming just takes things to another level
I just cannot go to given my religious convictions." *Id.* When
Murphy offered specific scenarios, such as taking a child to a
gay pride event, allowing non-cis-gender haircuts or dress, or
supporting a child's participation in an LGBTQ student
organization, Michael stated that he and his wife would not
allow the first two things and probably would not allow the
third. *Id.* Murphy offered additional training and resources to
clarify the regulatory requirements, to which Michael responded:
"I know that our beliefs are not going to change." *Id.* at 4.
Rebecca Gantt subsequently sent Murphy an email, explaining that
"we believe God created two distinct sexes and cannot lie to a
child about their God given identity. We cannot attend events
like pride parades because we cannot support what that type of
event stands for and promotes." *Id.*

On February 6, 2024, DCF issued a Notice of Decision
revoking the Gantts' foster care license, citing failure to
comply with licensing Rules 301, 315, and 037. ECF No. 17-9.
As noted above, Rule 301 states that "[f]oster parents shall
meet the physical, emotional, developmental and educational
needs of each foster child, in accordance with the child's case
plan." Rule 315 provides that "[f]oster parents shall support
children in wearing hairstyles, clothing, and accessories
affirming of the child's racial, cultural, tribal, religious, or

12

gender identity." Rule 037 states that "[a] license may be
denied or revoked if the applicant or licensee fails to meet any
licensing rules." For support, DCF cited the Gantts'
communications with Colburn and Murphy. The Gantts did not
appeal DCF's decision.

## Discussion

### I.   Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remedy."
*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). In
order to justify a preliminary injunction, a movant must
demonstrate: (1) irreparable harm absent injunctive relief; (2)
either a likelihood of success on the merits, or a serious
question going to the merits to make them a fair ground for
trial, with a balance of hardships tipping decidedly in the
plaintiff's favor; and (3) that the public's interest weighs in
favor of granting an injunction. *See Metro. Taxicab Bd. of
Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).
"When, as here, the moving party seeks a preliminary injunction
that will affect government action taken in the public interest
pursuant to a statutory or regulatory scheme, the injunction
should be granted only if the moving party meets the more
rigorous likelihood-of-success standard." *Id.* (citation
omitted); *see Friends of the E. Hampton Airport, Inc. v. Town of
E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).

13

## II.  Likelihood of Success

### A. Freedom of Speech

The parties' fundamental disagreement with respect to Plaintiffs' freedom of speech claim is whether the DCF Rules and Policies, as well as Defendants' actions, pertained primarily to speech or conduct.  Defendants argue conduct: that the Rules and Policies focus strictly on actions that are in the best interest of the foster child and do not require foster parents to espouse or endorse any form of ideology.  Plaintiffs allege compelled and restricted speech based on viewpoint.  "While the First Amendment protects the rights of citizens to express their viewpoints, however unpopular, it does not guarantee ideal conditions for doing so, since the individual's right to speech must always be balanced against the state's interest in safety, and its right to regulate conduct that it legitimately considers potentially dangerous." *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004).  Here, those state interests encompass the health and safety of LGBTQ youth in the foster care system.

Vermont law requires DCF to "protect and promote the welfare of children."  33 V.S.A. § 4903.  Accordingly, DCF's Rules require foster parents to "provide positive, constructive experiences for all children in their care."  Rule 010.  Policy 76 expands on these principles with respect to LGBTQ youth,

14

while recent Rule amendments similarly guide the care of children in the foster care system.

These Rules and Policies are, as discussed above, driven by research and feedback on the factors that improve outcomes for LGBTQ youth in foster care. Those outcomes include rates of depression, substance abuse, and suicide attempts. Given those concerns, DCF is tasked with ensuring that foster care licensees are able and willing to provide an accepting and supportive home. Confirming such capabilities relates directly to caregiver conduct. *See, e.g., Bates v. Pakseresht*, No. 2:23-CV-00474-AN, 2023 WL 7546002, at *16 (D. Or. Nov. 14, 2023) (concluding that state rule regulating foster care of LGBTQ youth "does not facially compel or restrict speech, but rather seeks to regulate an applicant's conduct in creating a respectful, affirming, and supportive home for a child in [the state's] care").

Plaintiffs argue that Defendants are compelling them to "speak the State's views while prohibiting them from expressing their religious views." ECF No. 17-2 at 8. Compliance with DCF Rules and Policies, however, is different from speech. Defendants did not compel Plaintiffs to change their beliefs, or to make any statements that disavowed those beliefs. Instead, Defendants were pursuing their mission of ensuring a welcoming, affirming, and safe home for each child.

15

Plaintiffs further argue that Defendants were compelling them to use preferred pronouns and to otherwise speak in ways that are contrary to their religious beliefs about gender and sexuality, while at the same time restricting them from expressing their own views on those issues.  The DCF Rules and Policies at issue, however, are based upon research and feedback regarding outcomes for LGBTQ youth.  The record does not establish that they are targeted at any religious viewpoint. Indeed, the alleged restrictions are at most incidental to rules of conduct designed to promote healthy and affirming homes.[1]

Defendants' briefing notes that the DCF Rules include a host of restrictions on potentially-harmful conduct, including requiring "healthy patterns of social and interpersonal relationships" (Rule 201.1), disciplining "in a constructive and educational manner" (Rule 201.3), and respecting the foster child's religious beliefs and cultural heritage (Rule 338).  ECF No. 26 at 29.  If those restrictions bar caregivers from, for example, using foul or abusive language in the home, or

---

[1] In *Bates*, the district court concluded that although on its face the Rule at issue did not compel speech, the State's application of the Rule was compelling speech as speech rather than conduct.  2023 WL 7546002, at *17.  Even if the Court were to reach that same conclusion here, the Court would still deny preliminary injunctive relief based upon its finding that the Rules and Policies in this case, both facially and as applied, satisfy strict scrutiny as discussed below.

espousing the superiority of their own religious practices, the burdens on speech are incidental to the well-being of the foster child.  Such incidental burdens are not unconstitutional.  *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) ("The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."); *Kerik*, 356 F.3d at 209.[2]

**B. Freedom of Association**

Plaintiffs next argue that they are entitled to relief because Defendants are violating their free association rights. The Constitution protects the right to "join together to advance shared beliefs, goals, and ideas, which, if pursued individually, would be protected by the First Amendment." *Sullivan v. Univ. of Washington*, 60 F.4th 574, 579 (9th Cir. 2023).  Defendants submit that most free association cases pertain to the right to exclude those whose participation would burden expressive rights.  ECF No. 26 at 31 (citing, *e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (pertaining to the Boy Scouts' right to exclude a gay scout leader)).  Here, rather than being denied the right to exclude others, Plaintiffs

---

[2]  In *Kerik*, the Second Circuit held that "a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment."  356 F.3d at 209.  The DCF Rules and Policies at issue are generally applicable for reasons discussed immediately below.

argue that they are being compelled to *join* in certain activities, such as a gay pride parade, that are counter to their religious beliefs. It is well established that freedom of association "plainly presupposes a freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

The Court finds that Plaintiffs are nonetheless unlikely to succeed on this claim. Nothing in the record indicates that Defendants are compelling Plaintiffs to associate with any specific person or group. Plaintiffs protest that their license denials were based in part on their professed inability to associate with certain events, as in a pride parade. When DCF raised the possibility of attending a gay pride parade, however, the suggestion was merely hypothetical. Indeed, while Policy 76 suggests that staff "encourage" such activities, there is no requirement that foster families engage in them. Nor are Defendants preventing Plaintiffs from associating with others who share their beliefs, as in attending church. What foster parents may not do is require children in their care to engage in activities that are non-affirming.

Plaintiffs submit that they want to attend church as a family, while also avoiding events that are antithetical to their beliefs. ECF No. 37 at 15. As the court found in *Bates*, however, "the Rule does not prevent plaintiff from continuing to associate with her religious activities and communities, nor

18

does it prevent her from including her biological children in those activities.  What the Rule does do is protect the associative rights of a child, in [the State's] care, who is placed in plaintiff's home, particularly when the activity that plaintiff seeks to expose the child to would disaffirm the child's LGBTQ+ identities."  2023 WL 7546002, at *29.  *Bates* found the plaintiff's compulsion argument equally unpersuasive: "plaintiff is not required to attend those events [such as a pride parade].  It is sufficient that she merely facilitates the attendance of a child placed in her care."  2023 WL 7546002, at *30.  The Court finds the reasoning in *Bates* persuasive, and that Plaintiffs are not likely to succeed on their free association claim.

### C. Free Exercise

Plaintiffs also seek preliminary injunctive relief on the basis of their free exercise claim.  The Free Exercise Clause "protects an individual's private right to religious belief, as well as the 'performance of (or abstention from) physical acts that constitute the free exercise of religion.'"  *Kane v. De Blasio*, 19 F.4th 152, 163–64 (2d Cir. 2021) (quoting *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014)).  To succeed on a Free Exercise Clause claim, a plaintiff must generally establish that "'the object of [the challenged] law is to

infringe upon or restrict practices because of their religious motivation,' or that its 'purpose . . . is the suppression of religion or religious conduct.'" *Okwedy v. Molinary*, 69 F. App'x 482, 484 (2d Cir. 2003) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("*Lukumi*")).

Free Exercise Clause protection "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Kane*, 19 F.4th at 163-64. When the government seeks to enforce a law that is neutral and of general applicability, "it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002). "If the law is not neutral or not generally applicable, it is subject to strict scrutiny, and the burden shifts to the government to establish that the law is narrowly tailored to advance a compelling government interest." *We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130, 144 (2d Cir. 2023).

When reviewing neutrality, the Court begins its analysis with the text of the relevant Rules and Policies. "A law is not neutral ... if it is specifically directed at a religious practice." *Cent. Rabbinical Cong.*, 763 F.3d at 193; *see Lukumi*,

508 U.S. at 533 ("if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral"). "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. at 533.

Here, nothing on the face of DCF's Rules and Policies targets religious practices or religious applicants. *See Bates*, 2023 WL 7546002, at *4 (concluding that a similar policy "makes no reference to any specific religious practice, nor does it implicate religion on its face"). Even without specific references to religion, however, a facially-neutral law may be unlawful if it "targets religious conduct for distinctive treatment." *Lukumi*, 508 U.S. at 534. The Court must therefore review "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* at 539.

The history of DCF's policy development with respect to LGBTQ youth in the foster care system is set forth above. Briefly stated, DCF's response was driven by community concerns and by recent research regarding outcomes for LGBTQ children in foster care settings. DCF's Rule and Policy revisions were

clearly implemented to guide caseworkers and caregivers, and to encourage screening practices to help ensure safe and healthy homes for those children.  Nothing in that history suggests religious targeting.

Application of DCF's Rules and Policies was similarly neutral.  "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.  The Free Exercise Clause protects against governmental hostility which is masked, as well as overt."  *Lukumi*, 508 U.S. at 534.  The Edmunds Declaration states that "DCF accepts prospective foster parents of all creeds and religions."  ECF No. 28 at 5, ¶ 15.  In this case, as the Board found in its review of the Notice of Decision, Defendants appear to have focused exclusively on whether Plaintiffs would be able to provide an accepting home.  Indeed, the record suggests that rather than expressing hostility to any set of religious beliefs, Defendants were acting consistent with the research-based policies developed by DCF for the care and protection of LGBTQ youth.

The policies are also generally applicable.  "The general applicability requirement prohibits the government from in a selective manner imposing burdens only on conduct motivated by religious belief."  *Cent. Rabbinical Cong.*, 763 F.3d at 196 (citation and quotation marks omitted).  "A law is not generally

applicable if it invites the government to consider the
particular reasons for a person's conduct by creating a
mechanism for individualized exemptions." *Fulton v. City of
Philadelphia,* 593 U.S. 522, 533 (2021) (quotations marks and
citations omitted).  "A law also lacks general applicability if
it prohibits religious conduct while permitting secular conduct
that undermines the government's asserted interests in a similar
way." *Id.* at 534.

Plaintiffs contend that exemptions in the DCF Rules mean
the Rules are not generally applicable.  However, the "mere
existence of an exemption procedure, absent any showing that
secularly motivated conduct could be impermissibly favored over
religiously motivated conduct, is not enough to render a law not
generally applicable and subject to strict scrutiny." *We The
Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 288-89 (2d Cir.),
*opinion clarified*, 17 F.4th 368 (2d Cir. 2021).  No exemption is
applicable here, as the variance provision in question (Rule
035) does not apply to the Rules that formed the basis for
Plaintiffs' license denials.

Furthermore, there is no indication that Defendants applied
the DCF Rules in a manner that penalizes families with
"religiously informed views."  ECF No. 17 at 21.  Instead,
Defendants focused on Plaintiffs' respective abilities to comply
with the Rules, regardless of the reasons underlying Plaintiffs'

23

objections.  While those reasons could be either religious or secular, the record suggests that the licensing outcome of such objections would be the same.  *See* ECF No. 28 at 5, ¶ 15 (Edmunds Declaration stating that "[u]ltimately, the reasons for an applicant's discomfort play no part in the analysis").  Because the DCF Rules and Policies do not compel Defendants or others within the department to "consider the particular reasons for a person's conduct," *Fulton*, 593 U.S. at 534, and because no exemption applies here, the Court finds that Rules and Policies at issue are generally applicable, and that Plaintiffs are unlikely to succeed on their free exercise claim.

### C. Constitutional Scrutiny

Given the Court's conclusion that DCF's Rules and Policies, both facially and as applied, are neutral and generally applicable, Defendants need only show a rational basis for their enforcement "even if enforcement of the law incidentally burdens religious practices."  *Fifth Ave. Presbyterian Church*, 293 F.3d at 574.  In this case that review is straightforward, as Defendants have shown that Policy 76 and related changes to DCF's Rules and Policies were prompted by feedback from various stakeholders, and by recent research showing the dangers inherent in failing to adequately accept and provide for LGBTQ youth in Vermont's foster care system.

24

Defendants argue alternatively that, regardless of the level of scrutiny, Plaintiffs are not likely to succeed. Official action "burdening religious conduct that is not both neutral and generally applicable . . . is subject to strict scrutiny." *Cent. Rabbinical Cong.*, 763 F.3d at 193.  When applying strict scrutiny, the Court considers whether Defendants' policies are "narrowly tailored" to serve a "compelling" state interest. *Lukumi*, 508 U.S. at 546.

It is well established that the government has a "compelling governmental interest in the protection of minor children." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999) (quotation marks and citation omitted); *see Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) (citing "the state's compelling interest in protecting children from abuse and neglect").  Creating rules and policies to protect the health and welfare of foster children therefore furthers a compelling state interest. *See New York v. Ferber*, 458 U.S. 747, 757 (1982) ("we have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights").

Plaintiffs argue that DCF is harming foster children by excluding non-affirming families, notwithstanding an alleged shortage of foster families in Vermont.  To the extent

Plaintiffs are concerned about foster families whose religious beliefs are not consistent with DCF policies, DCF does not compel such families to change or reject their beliefs. What it does require is the provision of an affirming environment for children who are, or who come to identify as, LGBTQ.

Narrow tailoring requires the government to demonstrate that a policy is the "least restrictive means" of achieving its objective. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). The government's justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures" imposing lesser burdens on religious liberty "would fail to achieve the government's interests, not simply that the chosen route was easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

Plaintiffs argue that the policies at issue here were not narrowly-tailored because certain categories of children, such as those who share the same faith tradition or attend the same church, could be placed with families such as themselves. That solution ignores the potential for a child to be placed and, post-placement, change their sexual identity in a material way. In that event, a family that is unwilling to provide the support mandated by DCF would no longer be a suitable placement for that

26

child.  In her Declaration, Barron attests that "[r]emoval of an
LGBTQ foster child from their placement specifically because of
their LGBTQ identity is extremely damaging to their
psychological and physical safety, mental health, well-being,
and normalcy."  ECF No. 27 at 6, ¶ 23.  The Court therefore
finds, based upon the current record, that the Rules and
Policies established and implemented by DCF and Defendants serve
the compelling interest of protecting the health and welfare of
LGBTQ youth and are narrowly-tailored to necessarily address
that interest.

### D. Vagueness

Plaintiffs also argue that the licensing scheme at issue is
unconstitutionally vague as applied.  A rule or regulation "is
unconstitutionally vague if persons of common intelligence must
necessarily guess at its meaning and differ as to its
application, or if it fails to give a person of ordinary
intelligence fair notice of conduct proscribed or required by
the regulation, and encourages arbitrary and erratic behavior on
the part of officials charged with enforcing the rule."  *Giano
v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citations
omitted).  "Although regulations with civil consequences
'receive less exacting vagueness scrutiny' than criminal
statutes, *see Arriaga v. Mukasey*, 521 F.3d 219, 223 (2d Cir.
2008), regulations that limit the exercise of constitutionally

27

protected rights are subject to an enhanced vagueness test, *see Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982)." *Hayes v. New York Att'y Grievance Comm. of the Eight Jud. Dist.*, 672 F.3d 158, 168 (2d Cir. 2012).

Plaintiffs focus on Rule 201.2 and Rule 301. Rule 201.2 requires "[k]knowledge of child and adolescent development and the needs of children." Rule 301 requires that foster parents be able to meet a child's "physical, emotional, developmental and education needs." Plaintiffs argue that neither Rule mentions screening for a parent's views on sexual and gender identities. Plaintiffs further contend that the DCF Rules, without stating as much, effectively allow only parents with "progressive views about gender" to be licensed. ECF No. 17-2 at 30.

Defendants point to the entire licensing scheme, including not only Rules 201.2 and 301, but also the non-discrimination provisions such as Rules 200, 201.10, and 315. Given that DCF clearly bars discrimination based upon gender identity, no reasonable reading of its Rules would call into question whether meeting "physical, emotional, and development . . . needs" requires sensitivity to both gender identity and gender identity development.

Plaintiffs are also unlikely to succeed on any claim that the Rules lend themselves to arbitrary or erratic enforcement.

In fact, the similarities in the Wuotis' and Gantts' licensing
experiences suggest that the Rules are being enforced
consistently and in keeping with the policy goals identified in
the Barron Declaration.  DCF has determined that LGBTQ children
require affirming homes, and Plaintiffs have made clear that
their religious beliefs prevent them from providing such
affirmation.  The DCF requirements on acceptance of gender
identity are clear and consistent, and nothing in their
application indicates arbitrary or erratic enforcement.
Consequently, Plaintiffs are not likely to succeed on their as-
applied challenge on basis of vagueness.

## III. Other Factors Weigh Against Granting Preliminary Relief

Plaintiffs contend that violation of their First Amendment
rights, standing alone, constitutes irreparable harm.  At the
preliminary injunction stage, however, "[b]ecause the
deprivation of First Amendment rights is an irreparable harm, in
First Amendment cases the likelihood of success on the merits is
the dominant, if not the dispositive, factor." *Agudath Israel
of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (quotation
marks and citation omitted).  As discussed above, the Court
finds that Plaintiffs are not likely to succeed on the merits of
their claims.

Plaintiffs' final assertion is that protecting First
Amendment rights is in the public interest.  They also contend

that by granting them foster care licenses, the State will increase its capacity to provide loving homes for vulnerable children. The record indicates that while both sets of Plaintiffs are capable of providing loving homes for many children, Defendants concluded that they do not satisfy DCF requirements with respect to fostering an LGBTQ child. According to DCF, the public interest is served by responding to the needs of such young people in Vermont's foster care system. Defendants' efforts to enforce DCF Rules and Policies, which are in turn supported by both community input and research on the positive impacts of affirming and supportive homes, tip the balance of public interest their favor.

### Conclusion

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction (ECF No. 17) is denied.

DATED at Burlington, in the District of Vermont, this 20th day of February, 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
District Court Judge